**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

Civil Action No. _____

---

Gregory Stenstrom, Pro Se
Plaintiff,

v.

Delaware County (*for identification of the rulemaking body*);
Delaware County Council (*for identification of the rulemaking body*);
Dr. Monica Taylor, in her official capacity;
Richard R. Womack, in his official capacity;
Kevin M. Madden, in his official capacity;
Elaine Paul Schaefer, in her official capacity;
Christine A. Reuther, in her official capacity;
Jack Larkin, in his official capacity;
and all persons acting under color of Ordinance 2025-06,
Defendants.

---

**COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**

**(42 U.S.C. § 1983; U.S. Const. Amends. I & XIV)**

---

## I. INTRODUCTION

1. Plaintiff Gregory Stenstrom brings this action under 42 U.S.C. § 1983 for declaratory and injunctive relief against Delaware County Ordinance 2025-06, which unlawfully establishes a Human Relations Commission ("HRC") with **subpoena power, adjudicative authority, fines, and compulsory exhaustion requirements**.

2. Ordinance 2025-06 **impermissibly forces residents into a partisan, unelected tribunal** as a prerequisite to judicial access, functioning as a modern "star chamber."

3. The Ordinance exceeds Delaware County's statutory authority under the **Pennsylvania Human Relations Act (PHRA)**, contravenes the

**Pennsylvania Constitution's separation of powers**, and violates the **First and Fourteenth Amendments** to the United States Constitution.

4. The Ordinance is also **retaliatory in purpose and effect.** Plaintiff has repeatedly exposed corruption and election misconduct in Delaware County, and in response has endured multiple defamation suits, sanctions threats, malicious prosecution, denial of Right-to-Know requests, and other lawfare. Ordinance 2025-06 was enacted to suppress Plaintiff and similarly situated citizen watchdogs.

5. Although Plaintiff appears to be a primary target of this Ordinance, its unconstitutional features — compulsory exhaustion, partisan adjudication, and duplicative authority — threaten the rights of all County residents.

## II. JURISDICTION AND VENUE

6. This Court has jurisdiction under *28 U.S.C. §§ 1331, 1343(a)(3), and 2201– 2202.*

7. Venue is proper in this District under *28 U.S.C. § 1391(b)*, as all Defendants reside in this District and the events giving rise to the claims occurred in Delaware County.

## III. PARTIES

8. **Plaintiff Gregory Stenstrom** is a qualified voter, and active pro se litigant residing in Glen Mills, Delaware County, Pennsylvania.

9. **Defendant Delaware County** is a political subdivision of the Commonwealth of Pennsylvania and is named solely *for identification of the rulemaking body*.

10. **Defendant Delaware County Council** is the legislative body that enacted Ordinance 2025-06 and is named solely *for identification of the rulemaking body*.

11. **Defendants Taylor, Womack, Madden, Schaefer, and Reuther** are Council members who voted for and advocated the Ordinance.

12. **Defendant Jack Larkin** is acting as an unconfirmed Deputy Solicitor of Delaware County and was a principal drafter and promoter of the Ordinance.

13. All Defendants are sued in their **official capacities.**

## IV. STANDING

14. Plaintiff has standing under *Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992).*

15. Plaintiff is directly injured by Ordinance 2025-06, which restructures adjudicative access for county residents.

16. Plaintiff has been explicitly targeted through retaliatory litigation and suppression of Right-to-Know and Sunshine Act cases. Ordinance 2025-06 was designed to obstruct Plaintiff's oversight activities.

17. Plaintiff faces imminent injury: he will be forced into an unlawful, biased tribunal before gaining access to the courts. This injury is **concrete, particularized, traceable to Defendants, and redressable by declaratory and injunctive relief.**

## V. FACTUAL ALLEGATIONS

18. On August 20, 2025, Delaware County Council adopted **Ordinance 2025-06**, establishing a Human Relations Commission with authority to:

    - issue subpoenas and compel sworn testimony;

    - conduct investigations and adjudicatory hearings;

    - impose fines up to $500 and order restitution;

    - mandate exhaustion before any court action may be filed.

19. The **PHRA, 43 P.S. § 962.1**, permits municipalities to establish commissions with "powers and duties similar to" the PHRC. But the PHRC itself does not impose compulsory exhaustion or adjudicate beyond its statutory scope. Delaware County has exceeded its authority.

    a. **Preemption by State and Federal Law.** The Pennsylvania Human Relations Act ("PHRA") and federal civil rights statutes already **occupy the field of discrimination enforcement.** The PHRA provides a comprehensive statewide framework through the Pennsylvania Human Relations Commission, with remedies for

Page **3** of **11**

employment, housing, and public accommodation claims. Likewise, federal law provides parallel remedies through Title VII of the Civil Rights Act, the Fair Housing Act, the Americans with Disabilities Act, the Age Discrimination in Employment Act, and Titles VI and IX. Each of these statutes includes investigation, conciliation, adjudication, and judicial review mechanisms. Ordinance 2025-06 does not create any substantive protections beyond those already available under state and federal law. Instead, it duplicates existing remedies and **adds only procedural obstacles, compulsory exhaustion, and partisan control.** By attempting to regulate an area already addressed comprehensively by state and federal law, Ordinance 2025-06 is **preempted and unnecessary.**

20. The Ordinance was introduced and championed by Council members and Defendant Larkin to obstruct litigation by pro se citizen watchdogs, including Plaintiff.

   a. **Partisan Appointment of "Volunteers."**
   Although styled as "volunteers," the commissioners are **exclusively appointed by County Council** and confirmed by the County Executive. They are not required to hold legal training, judicial qualifications, or to comply with judicial ethics canons. In practice, these "volunteers" operate as **political appointees and partisan gatekeepers,** selected by the very Council members whose actions they are expected to oversee. This structure strips citizens of neutral adjudication and instead places them under the control of unelected political actors, compounding both **Due Process violations** and the retaliatory purpose underlying the Ordinance.

   b. **Pattern of Coordinated Retaliation.**
   In case Delaware County Court of Common Pleas (CCP) case **CV-2023-005848**, seeking "millions of dollars" in damages against Plaintiff, Delaware County billing records demonstrate that Defendants coordinated no fewer than three defamation lawsuits against Plaintiff: *(1) James Savage v. President Trump, Stenstrom, et al.* (two separate cases consolidated in Philadelphia Court of Common Pleas); and *(2) James Allen v. Newsmax, Stenstrom, et al.* (Delaware County Court of Common Pleas). In all three cases, Plaintiff and co-Defendants prevailed through discontinuances and dismissals, with "truth" serving

as a complete defense, as Plaintiff's evidence of massive election fraud was never refuted on the merits.

   c. See also Appendix A (Coordinated Retaliation and Lawfare Against Plaintiff), attached hereto in the Memorandum of Law and incorporated by reference.

21. Prior to these suits, and during this same lawfare campaign, Defendants secured two sanctions orders totaling over **$100,000** against Plaintiff and Leah Hoopes for pressing election fraud claims and seeking to be heard on the merits — both sanctions later reversed on appeal. Defendants attempted sanctions on at least five other occasions, seeking millions of dollars in penalties.

22. These suits were not isolated. Defendants further coordinated with counsel at **Duane Morris LLP** to plant false "debunking" articles about Plaintiff in *FactCheck.org*, which were then disseminated through national and international media channels.

23. Defendants also pressed a **malicious prosecution case** against Plaintiff and Leah Hoopes, filed without jurisdiction or cause, which has continued for more than two years (since August 2023).

24. Collectively, these coordinated actions reflect a sustained campaign of lawfare, and retaliation designed to punish Plaintiff for fulfilling his statutory role as a "certified poll watcher" and "authorized representative" under Pennsylvania Election Code, to bankrupt him, and to deter further exposure of election misconduct in Delaware County. Ordinance 2025-06 was enacted against this backdrop as the next escalation in that campaign.

## VI. ANTICIPATED DEFENSES: ROOKER-FELDMAN, PULLMAN, YOUNGER

25. **Rooker-Feldman Doctrine:** This action does not seek appellate review of any state court judgment. Plaintiff challenges a newly enacted ordinance on its face and as applied. Relief sought is prospective and independent of any prior state judgment. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280 (2005).*

26. **Pullman Abstention:** Abstention is inappropriate because the constitutional claims are neither uncertain nor dependent on unsettled questions of state law. The PHRA provides no basis for counties to impose exhaustion or to arrogate judicial power. Delay through abstention would itself cause irreparable harm by chilling Plaintiff's right of access to the courts.

27. **Younger Abstention:** There is no ongoing state proceeding involving the ordinance that warrants abstention. Even if one were initiated, the bad-faith and retaliatory enactment of Ordinance 2025-06 removes it from Younger's protection. *See Huffman v. Pursue, Ltd., 420 U.S. 592 (1975).*

---

## VII. CLAIMS FOR RELIEF

### Count I – Violation of Due Process (U.S. Const. amend. XIV)

28. Ordinance 2025-06 forces Plaintiff into a biased tribunal of partisan appointees lacking neutrality or judicial safeguards. This violates due process. *Mathews v. Eldridge, 424 U.S. 319 (1976); Tumey v. Ohio, 273 U.S. 510 (1927); Ward v. Monroeville, 409 U.S. 57 (1972).*

### Count II – Ultra Vires & Separation of Powers (Pa. Const. art. V, § 1)

29. Judicial power in Pennsylvania resides exclusively in the courts. By delegating adjudicative authority to unelected volunteers, Defendants acted ultra vires. *Loper Bright Enters. v. Raimondo, 603 U.S. ___ (2024).*

### Count III – Denial of Access to Courts (U.S. Const. amends. I & XIV)

30. By conditioning judicial access on exhaustion before the HRC, Defendants violate Plaintiff's right of access to courts. *Christopher v. Harbury, 536 U.S. 403 (2002); Logan v. Zimmerman Brush Co., 455 U.S. 422 (1982).*

### Count IV – First Amendment (Compelled Speech & Viewpoint Discrimination)

31. Ordinance 2025-06 empowers commissioners to adjudicate disputes involving belief, speech, and association, risking compelled speech and viewpoint discrimination. *303 Creative LLC v. Elenis, 600 U.S. ___ (2023); Masterpiece Cakeshop v. Colorado, 138 S. Ct. 1719 (2018).*

32. Ordinance 2025-06 places expressive and associative activity within the discretionary reach of partisan appointees. Because the Commission can compel or penalize speech under vague "discrimination" rubrics, it creates a substantial risk of **compelled speech** and **viewpoint discrimination**— including in controversies branded as "equity" or "DEI" disputes—contrary to *303 Creative LLC v. Elenis* and *Masterpiece Cakeshop*. The Constitution does not allow a county to conscript citizens into government-favored expression or to punish disfavored viewpoints through an extrajudicial board.

**Count V – Retaliation (42 U.S.C. §§ 1983, 1985, 1986)**

33. As detailed in Section V (Factual Allegations), Defendants coordinated multiple defamation suits, malicious prosecution, sanctions campaigns, and media smear operations against Plaintiff, culminating in the enactment of Ordinance 2025-06 as a further retaliatory measure.

34. Ordinance 2025-06 was enacted as the latest escalation in a sustained campaign of retaliation against Plaintiff for exposing county corruption. This violates Plaintiff's rights under the First and Fourteenth Amendments.

**Count VI – Vagueness and Overbreadth (U.S. Const. amend. XIV & I)**

35. Ordinance 2025-06 is unconstitutionally vague and overbroad, enabling arbitrary enforcement and chilling protected expression. *Grayned v. City of Rockford, 408 U.S. 104 (1972).*

**Count VII – Preemption (U.S. Const. art. VI; Supremacy Clause)**

36. The **Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §§ 951–963**, and federal civil rights statutes (including **Title VII of the Civil Rights Act, the Fair Housing Act**, the **Americans with Disabilities Act**, the **Age Discrimination in Employment Act**, and **Titles VI and IX**) already provide comprehensive remedies for discrimination in employment, housing, education, and public accommodations.

37. Ordinance 2025-06 is **preempted** because it attempts to regulate in an area already fully occupied by state and federal law. The Ordinance does not create substantive protections beyond those available under existing statutes,

but instead imposes **duplicative procedures, compulsory exhaustion, and partisan control**.[1]

38. By enacting **Ordinance 2025-06**, Defendants unlawfully interfered with the uniform statewide and federal framework governing discrimination remedies. The Ordinance is therefore unconstitutional under the **Supremacy Clause of the United States Constitution (U.S. Const. art. VI)** and ultra vires under Pennsylvania law.

**Count VIII – Equal Protection (U.S. Const. amend. XIV)**

39. Plaintiff incorporates the preceding paragraphs as if set forth fully herein.

40. Ordinance 2025-06 is facially neutral but vests **standardless discretion** in partisan appointees of County Council to decide what constitutes "discrimination," enabling **selective enforcement** against disfavored speakers and litigants while excusing allies.

41. The Supreme Court has long held that facially neutral laws that confer unbridled discretion on officials violate Equal Protection when they invite arbitrary enforcement. *Yick Wo v. Hopkins*, 118 U.S. 356 (1886); see also "class-of-one" enforcement principles, *Village of Willowbrook v. Olech*, 528 U.S. 562, 564–65 (2000).

42. By leaving undefined categories such as "height," "weight," and "source of income" to partisan "volunteers" wielding subpoena, adjudication, and fining powers, Ordinance 2025-06 invites discriminatory application **by design**, violating the Equal Protection Clause.

43. The Ordinance's undefined categories and standardless discretion enable **selective enforcement** of politically freighted disputes—e.g., "equity/DEI" controversies—against disfavored speakers while excusing allies. Facially neutral text that delegates such open-ended power violates Equal Protection by design. *Yick Wo v. Hopkins*, 118 U.S. 356 (1886); *Village of Willowbrook v. Olech*, 528 U.S. 562, 564–65 (2000).

---

[1] See, e.g., Arizona v. United States, 567 U.S. 387, 401–02 (2012) (field preemption applies where federal law occupies the entire field of regulation); Pennsylvania Restaurant & Lodging Ass'n v. City of Pittsburgh, 211 A.3d 810, 823 (Pa. 2019) (striking local ordinance as preempted where state law provided comprehensive regulation).

44. **WHEREFORE**, Plaintiff requests declaratory and injunctive relief as set out in the Request for Relief below.

**Count IX – All Writs Act / Ancillary Mandamus (28 U.S.C. § 1651(a))**

45. Plaintiff incorporates the preceding paragraphs.

46. The Court has authority under the All Writs Act to "issue all writs necessary or appropriate in aid of [its] jurisdiction." 28 U.S.C. § 1651(a).

47. Ordinance 2025-06 takes effect on January 1, 2026, and would immediately obstruct Article III adjudication by forcing litigants into a partisan tribunal that wields subpoena, adjudicatory, and fining powers as a precondition to judicial access.

48. To preserve this Court's jurisdiction and to prevent evasion or circumvention of federal relief, ancillary writs are necessary to maintain the status quo and to bar any back-door implementation or re-labeling of the enjoined functions (mandatory exhaustion, subpoena/investigation, adjudication, fines) pending final judgment.

49. **WHEREFORE**, Plaintiff requests such writs and ancillary relief as necessary or appropriate in aid of the Court's jurisdiction and to give effect to its injunctive and declaratory orders, as set out in the Request for Relief.

## VIII. REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

1. **Declare Delaware County Ordinance 2025-06 unconstitutional and ultra vires in its entirety; and,**

2. **In the alternative, should the Court decline to strike the Ordinance in full**, declare it unconstitutional and enjoin specifically:

   (i) the compulsory exhaustion requirement;
   (ii) the grant of subpoena authority to the Commission;
   (iii) the grant of adjudicatory authority to issue fines, sanctions, or binding orders.

3. **Preliminarily and permanently enjoin Defendants**, their officers, agents, employees, and all persons acting in concert with them, from enforcing, implementing, or taking any action under Ordinance 2025-06 as declared unconstitutional above;

4. **Inseverability.** Declare that the Ordinance is **inseverable**: its core functions are exhaustion, subpoenas/investigation, adjudication, and fines; without those provisions, it collapses into redundancy with the PHRA. Enjoin enforcement of the Ordinance **in its entirety**.

5. **Reasoned Written Opinion.** Request that the Court issue a **reasoned written opinion with findings of fact and conclusions of law** sufficient for appellate review, consistent with *SEC v. Chenery Corp.*, 318 U.S. 80 (1943) and Fed. R. Civ. P. 52(a).

6. **All Writs (Anti-Circumvention).** Pursuant to 28 U.S.C. § 1651(a), issue all writs necessary or appropriate in aid of the Court's jurisdiction, **including writs to prevent any re-labeling or circumvention** of enjoined functions (mandatory exhaustion, subpoena/investigation, adjudication, fines) pending final judgment.

7. **Award Plaintiff** costs and attorneys' fees under 42 U.S.C. § 1988, and Fed. R. Civ. P. 54(d)(1) and 28 U.S.C. § 1920, together with such other and further relief as this Court deems just and proper;

8. **Grant** such other and further relief as this Court deems just and proper.

---

## IX. JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiff hereby demands trial by jury on all issues triable of right by a jury, including claims brought under 42 U.S.C. § 1983 for damages and related relief.

---

**Respectfully submitted,**

**Gregory Stenstrom, Pro Se**

1541 Farmers Lane
Glen Mills, PA 19342
856-264-5495
gregorystenstrom@gmail.com
gstenstrom@xmail.net

Dated: September 14, 2025

---

**VERIFICATION**

I, Gregory Stenstrom, verify that the statements made in this Complaint are true and correct to the best of my knowledge, information, and belief. I understand that false statements herein are made subject to the penalties of 18 Pa.C.S. § 4904 relating to unsworn falsification to authorities.

**Gregory Stenstrom, Pro Se**

Date: September 14, 2025

---

# EXHIBIT A

**EXHIBIT A - Coordinated Retaliation and Lawfare Against Plaintiff**

Plaintiff submits this Exhibit to document the sustained pattern of coordinated retaliation by Delaware County officials, solicitors, and affiliated counsel, which culminated in the enactment of Ordinance 2025-06. The record demonstrates a deliberate campaign of defamation, malicious prosecution, sanctions, and media smear tactics designed to obstruct Plaintiff's rights and suppress evidence of election misconduct.

All docket sheets and orders referenced herein are true and correct copies available upon request and will be supplied by supplemental declaration if the Court so directs.

---

**1. Defamation Lawsuits (2020–2023)**

- *James Savage v. President Trump, Stenstrom, et al. - Case ID No.: 211002495* — two (consolidated) cases filed in Philadelphia Court of Common Pleas.

- *James Allen v. Newsmax, Stenstrom, et al. - CV-2022-008511* — filed in Delaware County Court of Common Pleas.

- All actions were ultimately discontinued or dismissed in favor of Defendants. "Truth" served as a complete defense, as Plaintiff's evidence of election fraud was never refuted on the merits.

---

**2. Media Smear Campaign (2021–2022)**

- County solicitors coordinated with **Duane Morris LLP** to plant false "debunking" stories in *FactCheck.org*.

- These stories were then amplified across national and international media, damaging Plaintiff's reputation and undermining his litigation.

---

**3. Malicious Prosecution (Ongoing >3 years)**

- *Delaware County et al v Stenstrom and Hoopes CV-2023-006723*

- Defendants initiated a malicious prosecution action against Plaintiff and Leah Hoopes without jurisdiction or legal cause.

- The matter has dragged on for more than two years, imposing financial and reputational costs despite the absence of any merits ruling.

**4. Sanctions Campaign (2020–2024)**

- Defendants secured two sanctions orders totaling more than **$100,000** against Plaintiff and Hoopes for pressing election fraud evidence and seeking to be heard on the merits. Both sanctions were later **reversed on appeal.**

- At least five additional sanctions motions were filed, seeking millions of dollars in penalties. Each was denied.

---

**5. Purpose and Continuation: Ordinance 2025-06**

- These coordinated lawsuits, sanctions, and media operations demonstrate a consistent pattern of **retaliation and lawfare** against Plaintiff.

- Ordinance 2025-06 is the latest escalation — creating a partisan "star chamber" tribunal of unelected political appointees with subpoena and adjudicatory power.

- The Ordinance functions not to protect residents, but to obstruct Plaintiff's oversight activities and deter further exposure of Delaware County's misconduct.

---

**Summary**

Exhibit A establishes that Ordinance 2025-06 cannot be viewed in isolation. It arose directly from a broader campaign of retaliation against Plaintiff, in violation of the **First and Fourteenth Amendments** and actionable under **42 U.S.C. §§ 1983, 1985, and 1986.**

# EXHIBIT B

**EXHIBIT B – Illustrative Enforcement Scenarios of HRC's**

**Purpose & Scope.** This Exhibit compiles **documented enforcement patterns** from existing federal, state, and municipal regimes to demonstrate that there is **no remedial gap** justifying a new county Human Relations Commission with **quasi-judicial powers**. Where civil-rights or access issues arise, current law already provides **substantive standards** and **judicially reviewable remedies**. By contrast, Ordinance 2025-06 would add **unbounded discretion—mandatory exhaustion**, **subpoenas**, **hearings**, and **fines**—inviting **arbitrary**, **speech-adjacent** enforcement and **chilling** protected activity. The examples that follow are **illustrative, not exhaustive**; they show how "neutral" rules administered through **discretionary levers** often oscillate between permissive and punitive results, precisely the **constitutional defect** (due process, neutrality, access to courts, compelled speech) challenged here.

---

## TABLE OF CONTENTS

---

| Section | Target | Page |
|---------|--------|------|
| I | Race, Ethnicity & Color | 3-4 |
| II | Religion & Creed | 4-6 |
| III | National Origin | 6-8 |
| IV | Citizenship Status / Language | 8-9 |
| V | Ancestry | 10-11 |
| VI | Sex | 11-12 |
| VII | Gender Identity & Expression | 12-13 |

| Section | Target | Page |
|---|---|---|
| VIII | Sexual Orientation | 14-16 |
| IX | Genetic Information | 15-17 |
| X | Marital Status | 17-19 |
| XI | Familial Status | 19-20 |
| XII | Educational Status | 20-22 |
| XIII | Disability | 22-23 |
| XIV | Source of Income / Payment Methods | 23-24 |
| XV | Age | 25-26 |
| XVI | Height | 26–27 |
| XVII | Weight | 27–28 |
| XVIII | Veteran Status | 29-30 |
| XIX | Use of Support Animals | 30–31 |
| XX | Sexual Violence Victim Status | 30–32 |
| XXI | Firearm Rights | 32–34 |
| XXII | Election Integrity | 34–35 |

## I. TARGET: RACE, ETHNICITY & COLOR

In **2015**, Boston's Museum of Fine Arts scaled back and then effectively ended its "**Kimono Wednesdays**" program after protests over cultural appropriation, even though the event was built around a kimono loan in connection with Monet's *La Japonaise* and Japanese partners.[1] Similarly, the **University of Ottawa** suspended a campus **yoga** class in **2015/2016** after complaints it reflected cultural appropriation, despite the instructor's offer to retitle the class as "mindful stretching."[2] These episodes show how quickly benign cultural participation can be reframed as offense and then chilled through policy reactions.

In **New York City**, **deceptive-practice** rules enforced by the **Department of Consumer and Worker Protection (DCWP)** treat misrepresentation in menu/labeling (e.g., "authentic" claims) as a **deceptive trade practice** subject to enforcement; **California** separately codifies "truth-in-menu" via **Health & Safety Code § 114087**, making **mislabeling** of food a misdemeanor.[3]

---

[1] **MFA "Kimono Wednesdays."** See *MFA backs down over kimono event in response to protests*, **Boston Globe** (July 7, 2015) (noting the museum would "recast" the event in response to protests) (online) (reporting on program change); *Tensions, questions at MFA's reconfigured 'Kimono Wednesdays'*, **Boston Globe** (July 8, 2015) (describing reconfigured program and continuing protest) (online); *Counter-protesters join kimono fray at MFA*, **Boston Globe** (July 18, 2015) (documenting escalating protests and counter-protests) (online).

[2] **University of Ottawa yoga class.** *University yoga class canceled because of "oppression, cultural genocide,"* **Washington Post** (Nov. 23, 2015) (reporting cancellation and quoted email) (online); see also **TIME** (Nov. 23, 2015) (summarizing the cancellation rationale and instructor's proposal to rename the class), and **The Independent** (Nov. 22, 2015) (same).

[3] **Deceptive/menu claims (NYC & CA).**
**NYC:** N.Y.C. Admin. Code **§ 20-700** (Consumer Protection Law) (**"No person shall engage in any deceptive or unconscionable trade practice … in the sale … of any consumer goods or services."**) (DCWP enforces); DCWP summary of authority (Consumer Protection & Licensing Laws). **Pin:** § 20-700 text. American Legal Publishing NYC.gov
**CA:** Cal. Health & Safety Code **§ 114087(a)** (**"Food … shall be honestly presented in a way that does not mislead or misinform the consumer."**) (commonly cited as "truth-in-menu"). **Pin:** § 114087(a). FindLaw Codes Justia Law
*Illustrative enforcement background:* see class actions/settlements over "Kobe beef" representations (California/New York) demonstrating how authenticity claims trigger deceptive-practice remedies. **E.g.** *Barney's Beanery Kobe Beef Class Action Settlement* (C.D. Cal. 2014) (settlement terms summarized).

At the **local enforcement** level, NYC agencies actively process **odor** and air-quality complaints from restaurants under the **Air Code**, and DEP has issued violations tied to **restaurant odors** (and related emissions/noise) — illustrating how neutral-sounding regulations can be deployed in culturally freighted contexts and against small immigrant businesses.[4]

More broadly, U.S. disputes over **attire and cultural expression** often end up under **religion/national-origin** frameworks, with courts repeatedly recognizing claims when schools or agencies target religious or heritage expression — from **Native students' eagle-feather regalia** at graduation, to **Native hair** cases, to **Sikh kirpan** accommodations.[5]

---

## II. TARGET: RELIGION & CREED

---

Public schools and agencies already operate under well-settled First Amendment rules—there is **no remedial gap** to justify a county HRC with quasi-judicial powers. **Students' private religious expression** (e.g., a brief "bless you") is protected unless officials can show **material and substantial disruption**; by contrast, **school-**

---

[4] **Odor/air complaints & DEP violations (NYC).**
**Complaints:** NYC DEP **Air Pollution Control Code** overview; NYC311 **Restaurant Odor** channel (DEP handles restaurant-odor complaints). **Pins:** DEP Air Code page; NYC311 Restaurant Odor page. NYC.gov NYC311
**Example violation:** DEP-confirmed odor/noise violation issued to a Brooklyn restaurant (reporting with agency confirmation). **Pin:** violation reported/confirmed. Greenpointers
*(These show the mechanism of neutral enforcement tools — odor/emissions rules — that can be turned on small ethnic food businesses.)*

[5] **Cultural/religious attire expression — school cases (exemplars).**
**Eagle feather at graduation:** *Waln v. Dysart Unified Sch. Dist.*, **54 F.4th 1152, 1158–60** (9th Cir. **2022**) (reversing dismissal; selective enforcement of cap-decoration ban plausibly burdened free exercise/speech). **Pin:** 1158–60. Ninth Circuit Court of Appeals
**Native hair (religious)**: *A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.*, **611 F.3d 248, 252–53, 270–72** (5th Cir. **2010**) (holding policy burdened religious practice; relief under state RFRA). **Pins:** 252–53 (facts); 270–72 (holding). Fifth Circuit Court
**Sikh kirpan in school:** *Cheema v. Thompson*, **67 F.3d 883, 885–86** (9th Cir. **1995**) (prelim. inj.; district had to consider accommodations used elsewhere). **Pin:** 885–86. FindLaw Case Law
**(Employment comparator — hijab):** *EEOC v. Abercrombie & Fitch Stores, Inc.*, **575 U.S. 768, 770–73** (2015) (Title VII liability for refusing to accommodate religious headscarf even without "actual knowledge"). **Pin:** 770–73.

**organized or school-amplified prayer** that carries the **imprimatur of the state** is barred.[6] Government must remain **neutral** toward private religious exercise and may not suppress it to enforce a vague "secularism" norm.[7]

Statutory frameworks reinforce the same structure. **California Education Code § 48907(a)** protects student expression unless it is obscene, libelous/slanderous, or incites unlawful acts or **substantial disruption**; schools cannot rely on amorphous "offense" to censor religious (or anti-religious) viewpoints.[8] In limited public fora, excluding religious speech while allowing comparable secular content is **viewpoint discrimination**.[9]

Outside the classroom, **Title VII** already requires **reasonable accommodation** of religious practice in employment, and the Supreme Court has clarified that "undue hardship" means **substantial increased costs** in relation to the conduct of the business, not the de minimis standard some courts had applied.[10] These rules—together with federal agency guidance—supply remedies for ordinary workplace conflicts (e.g., schedule changes, grooming/attire, language usage) without resort to an ad-hoc county tribunal.

---

[6] **Student speech vs. school endorsement.** *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, **393 U.S. 503, 509, 514** (1969) (student expression protected absent **material and substantial** disruption); *Santa Fe Indep. Sch. Dist. v. Doe*, **530 U.S. 290, 308–10** (2000) (football-game PA "student-led" prayers conveyed **state endorsement**, violating Establishment Clause).

[7] **Neutrality toward private religious exercise.** *Kennedy v. Bremerton Sch. Dist.*, **142 S. Ct. 2407, 2421–22** (2022) (district could not punish quiet, private post-game prayer; the Constitution requires **neutrality**, not hostility, toward religious exercise).

[8] **California student-expression statute. Cal. Educ. Code § 48907(a)** (protects student expression except where obscene, libelous/slanderous, or inciting **unlawful acts or substantial disruption**).

[9] **Viewpoint discrimination in limited public fora.** *Good News Club v. Milford Cent. Sch.*, **533 U.S. 98, 106–08** (2001) (excluding religious club where comparable secular clubs were allowed was **viewpoint discrimination**).

[10] **Religious accommodation in employment.** *Groff v. DeJoy*, **143 S. Ct. 2279, 2294–95** (2023) (employer must show **substantial increased costs** to deny accommodation); see also *EEOC v. Abercrombie & Fitch Stores, Inc.*, **575 U.S. 768, 770–73** (2015) (liability where need for accommodation was a motivating factor even without "actual knowledge").

The **discretion** problem is the constitutional one. In **Fulton v. City of Philadelphia**, the Supreme Court held that once officials retain **case-by-case exemptions**, a policy ceases to be **generally applicable**, and enforcement **fails neutrality**.[11] That same risk is heightened by a partisan HRC endowed with **subpoena, hearing, and fining** powers: "neutral" rules about speech, signage, or programming could be **selectively** used to punish religious wording in one context while excusing comparable secular language in another—**arbitrary**, **uneven**, and constitutionally suspect.

## III. TARGET: NATIONAL ORIGIN

Schools often try to police **casual religious speech** (e.g., a student's brief "bless you") on the theory it might offend or imply school endorsement. The First Amendment draws a very different line: **students' private religious expression is protected** unless it **materially disrupts** school operations; by contrast, **school-organized or school-amplified prayer** that carries the imprint of the state can violate the Establishment Clause.[12] Thus, although districts may regulate genuine disruption, they may not suppress private religious speech simply to enforce a vague "secularism" norm.[13]

California's student-expression framework reflects the same structure. **Cal. Educ. Code § 48907** protects student expression unless it is obscene, libelous, slanderous, or

---

[11] **Discretion defeats neutrality.** *Fulton v. City of Philadelphia*, **141 S. Ct. 1868, 1877–79** (2021) (policy not **generally applicable** where officials retained **discretionary exemptions**; selective, ad-hoc enforcement triggers strict scrutiny).

[12] **Student speech / disruption standard; private vs. school speech.** *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, **393 U.S. 503, 509, 514** (1969) (students do not "shed" First Amendment rights; schools need a showing of **material and substantial** disruption to justify suppression); *Mahanoy Area Sch. Dist. v. B.L.*, **141 S. Ct. 2038, 2046–47** (2021) (off-campus student speech remains protected; disruption analysis remains central).

[13] **No suppression to enforce vague secularism.** *Kennedy v. Bremerton Sch. Dist.*, **142 S. Ct. 2407, 2421–22** (2022) (district could not punish coach's quiet, private post-game prayer; government must be **neutral** toward private religious expression).

incites unlawful acts or substantial disruption; schools cannot rely on amorphous "offense" or viewpoint dislike to censor religious (or anti-religious) viewpoints.[14]

Outside the classroom, the Court has repeatedly condemned **viewpoint discrimination** against religious speech: a school district may not open a forum to secular youth clubs while excluding religious clubs, and it cannot treat religious speech as uniquely dangerous to neutrality.[15] At the same time, the Court has **barred school-endorsed prayer** run through official channels (e.g., the PA system at football games) even when nominally "student-led," because the practice **conveys state endorsement**.[16] The modern rule is simple: **government may not compel or orchestrate religious exercise**, but **it must remain neutral** toward private religious expression.[17]

In the broader civil context, **discretionary enforcement** of "neutral" policies against religious actors invites arbitrary outcomes. Where a government's code allows **ad hoc exemptions** for some but not for religious claimants, enforcement is not truly neutral — and fails strict scrutiny.[18] In the workplace, Title VII likewise demands **reasonable accommodation of religion** (and after *Groff*, more than a de minimis excuse),

---

[14] **California student-expression statute. Cal. Educ. Code § 48907(a)** (student expression protected unless obscene, libelous/slanderous, or inciting unlawful acts/substantial disruption; no **viewpoint** bans).

[15] **Viewpoint neutrality toward religious clubs/speech.** *Good News Club v. Milford Cent. Sch.*, **533 U.S. 98, 106–08** (2001) (exclusion of religious club from limited public forum was viewpoint discrimination).

[16] **No school-endorsed prayer over school channels.** *Santa Fe Indep. Sch. Dist. v. Doe*, **530 U.S. 290, 308–10** (2000) (football-game PA "student-led" prayers violated Establishment Clause because policy conveyed **state endorsement**).

[17] **Neutrality principle summarized.** *Kennedy*, **142 S. Ct. at 2421–22** (no hostility to private religious practice); *Tinker*, **393 U.S. at 509, 514** (need disruption, not mere offense).

[18] **Arbitrary/enforcement discretion against religious actors.** *Fulton v. City of Philadelphia*, **141 S. Ct. 1868, 1877–79** (2021) (policy not **generally applicable** where officials retained **discretionary exemptions** used for some but withheld from religious claimant).

underscoring that "offense" alone is not a lawful basis to penalize ordinary religious practice.[19]

---

## IV. TARGET: CITIZENSHIP STATUS / LANGUAGE

---

In **New York City**, the **NYC Human Rights Law (NYCHRL)** treats **language, accent, English-only rules, and fluency requirements** as aspects of **national-origin/immigration-status** discrimination, enforced by the **NYC Commission on Human Rights (NYCCHR)** through penalties and mandated training in housing and public accommodations.[20] Separately, **Local Law 30 (2017)** requires **city agencies** to provide language access (interpretation/translation) in top-need languages, a regime that—when paired with licensing/inspection touchpoints—can **pressure small operators** on signage/translation practices.[21] **Philadelphia** has likewise institutionalized **language-access obligations** for city agencies through **Executive Order 7-17**, with implementation cascading through permitting and public-facing services.[22]

---

[19] **Workplace accommodation baseline.** *EEOC v. Abercrombie & Fitch Stores, Inc.*, **575 U.S. 768, 770–73** (2015) (employer liability even without actual knowledge if need for religious accommodation was a motivating factor); *Groff v. DeJoy*, **143 S. Ct. 2279, 2294–95** (2023) (Title VII "undue hardship" now requires showing of **substantial increased costs**, not mere "more than de minimis").

[20] **NYCCHR enforcement / NYCHRL coverage.** N.Y.C. Admin. Code **§ 8-107(1)(a)** (unlawful to discriminate in employment, housing, or public accommodations on the basis of **national origin** or **immigration status**); **NYC Commission on Human Rights, Legal Enforcement Guidance: Discrimination on the Basis of Immigration Status and National Origin** (Sept. 2018) (addressing **accent**, **English-only** policies, **fluency** requirements, and language-access as part of national-origin discrimination). **Pins:** § 8-107(1)(a); Guidance at 1–2, 9–12.

[21] **NYC Local Law 30 (2017).** Local Law No. **30** (Aug. 2017) (language-access requirements for **city agencies**, including translation of vital documents and interpretation services in designated languages); see also NYC MOIA/Language Access Plan materials (agency implementation). **Pins:** LL 30 §§ 2–3.

[22] **Philadelphia language-access framework. Exec. Order No. 7-17** (July 28, 2017), *Access to City Programs and Activities for Individuals with Limited English Proficiency* (Mayor Kenney) (directing **all City departments** to provide interpretation/translation as needed; department LEP plans). **Pins:** §§ 1–3.

Courts have long recognized that **accent discrimination** can be **national-origin discrimination** under **Title VII**: disciplining workers for a **Spanish (or other) accent** without a **job-related** necessity is unlawful, while employers may consider accent **only** when it **materially interferes** with the specific job's communication duties.[23] EEOC's rule on **English-only** policies likewise warns that blanket "English at all times" rules are typically unlawful; only **narrow, business-necessity** English-only rules survive.[24] Consistent with these principles, courts have sustained claims challenging overbroad English-only rules (or job-ad fluency demands) while permitting narrowly tailored, **job-related** requirements where communications are central to performance.[25] In practice, **human-rights commissions** and agencies have moved against job postings that require "**English fluency**" **without showing job necessity**, framing such ads as exclusionary to immigrants under local law.[26]

**Net effect:** Even where owners cite customer-service needs, **discretionary enforcement** of "neutral" language policies (fluency requirements, English-only rules, signage/translation) can **swing between permissive and punitive**—exactly the risk posed by an HRC with **unbounded discretion**.

---

[23] **Accent as national-origin discrimination / job-related defense.** *EEOC v. Premier Operator Servs., Inc.*, **113 F. Supp. 2d 1066, 1071–73** (N.D. Tex. **2000**) (discipline based on **Spanish accent** actionable; employer must show **job-related necessity**); *Fragante v. City & Cnty. of Honolulu*, **888 F.2d 591, 595–97** (9th Cir. **1989**) (accent may be a legitimate criterion **only** where it **materially interferes** with job performance), **cert. denied**, 494 U.S. 1081 (1990).

[24] **EEOC English-only rule. 29 C.F.R. § 1606.7(a)–(b)** (English-only rules **at all times** presumed to violate Title VII; limited English-only rules must be **narrowly tailored** to **business necessity**).

[25] **Representative English-only/fluency cases.** *Garcia v. Spun Steak Co.*, **998 F.2d 1480, 1486–87** (9th Cir. **1993**) (no Title VII liability where plaintiffs failed to show adverse impact from English-only rule; reiterating **business necessity** standard); *Maldonado v. City of Altus*, **433 F.3d 1294, 1305–10** (10th Cir. **2006**) (reversing summary judgment against employees challenging broad English-only policy; issues of **pretext** and **business necessity**), abrogated on other grounds by *Metzler v. Fed. Home Loan Bank*, 464 F.3d 1164 (10th Cir. 2006).

[26] **Local job-ad enforcement (English-fluency).** N.Y.C. Admin. Code **§ 8-107(1)(a), (l)** (unlawful discriminatory **advertising** in employment; Commission may prosecute job ads that deter protected classes); **NYCCHR** Guidance (Sept. 2018), supra **note 1**, at 10–12 (fluency/accent rules must be **job-related**; blanket "English fluent only" ads risk **national-origin** discrimination).

## V. TARGET: ANCESTRY

In **Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations (1973)**, the Supreme Court **upheld** a city ordinance barring **sex-segregated "Help Wanted—Male/Female"** ads, confirming that long-standing industry categories in **commercial advertising** can be recast as **unlawful discrimination** under civil-rights law.[27] Local commissions have relied on similar authority to police **advertising and promotional practices**: in **New York City**, the **NYC Human Rights Law (NYCHRL)** prohibits **discriminatory advertising** in employment and **public accommodations**, and the **NYC Commission on Human Rights** has pursued "exclusionary advertising" where promotions, signage, or copy **favor** or **disfavor** protected groups (including religion/ethnicity).[28] In **New Jersey**, the **Law Against Discrimination (LAD)** bars **sex discrimination** in public accommodations, and the Division on Civil Rights has treated **"Ladies' Night"**-style promotions and other **sex-based perks** as unlawful discrimination in public accommodations.[29]

On the **age** side, regulators and courts scrutinize **birth-year/cohort** classifications in pricing and promotions. While the **ADEA** (29 U.S.C. § 621 et seq.) addresses **employment**, several jurisdictions police **age-based discounts** in **public accommodations**: Washington, D.C.'s OHR has ruled **young-adult** discounts unlawful, and California's **Unruh Civil Rights Act** has been applied to strike **age-**

---

[27] **Commercial speech & sex-segregated ads.** *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rel.*, **413 U.S. 376, 388–91** (1973) (upholding city ban on "Help Wanted—Male/Female" columns; discriminatory job ads are not protected commercial speech).

[28] **NYC discriminatory advertising & public accommodations.** N.Y.C. Admin. Code **§ 8-107(1)(a)** (employment), **§ 8-107(4)** (public accommodations), and **§ 8-107(5)** (advertising) (prohibitions on discrimination and discriminatory advertising); **NYCCHR** enforcement authority includes corrective training/penalties for "exclusionary advertising" in public-facing promotions.

[29] **New Jersey LAD / public accommodations & "Ladies' Night."** N.J. Stat. Ann. **§ 10:5-12(f)(1)** (unlawful discrimination in **places of public accommodation** because of **sex**); see N.J. Div. on Civil Rights administrative enforcement treating **sex-based promotional pricing** ("Ladies' Night") as unlawful discrimination in public accommodations under the LAD.

**tiered pricing** (e.g., **Tinder** charging older users more).[30] Stretching those logics, a display or campaign that highlights a single **ethnic holiday** (e.g., **Lunar New Year** horse décor) can be attacked as **ancestry-favoring**, and a themed promotion tied to a **zodiac birth year** can be attacked as **age-favoring** — turning a cultural celebration into **bureaucratic liability** whenever a commission wields **unbounded discretion** over "neutral" rules.[31]

---

## VI. TARGET: SEX

---

In **September 2017**, two transgender high-school students in the **South Glens Falls Central School District (NY)** reported being removed from a school bus after refusing a driver's directive to sit on the "girls' side" during a **gender-segregated seating** arrangement; according to district statements and local reporting, the superintendent later reaffirmed the district's nondiscrimination commitments and implemented **staff training** to address gender-related issues on transportation.[32] This kind of incident sits squarely in the legal framework that: (a) forbids **sex-based stereotyping and disparate treatment** in schools under **Title IX**; and (b) protects **transgender students'** access to school programs and services consistent with their gender identity under federal and New York law.[33] Courts have emphasized that

---

[30] **Age-based promotions in public accommodations.** (a) **D.C. OHR** age-discrimination rulings (young-adult discounts unlawful under D.C. Human Rights Act); (b) *Candelore v. Tinder, Inc.*, **19 Cal. App. 5th 1138, 1149–55** (Cal. Ct. App. **2018**) (age-tiered subscription pricing stated a claim under the **Unruh Act**).

[31] **Discretion & neutrality risk (analogy).** *Fulton v. City of Philadelphia*, **141 S. Ct. 1868, 1877–79** (2021) (policy not generally applicable where officials retained **discretionary exemptions**; selective, ad hoc enforcement fails neutrality and triggers strict scrutiny).

[32] **South Glens Falls (2017) — district acknowledgments & training.** Local reporting and district communications (Sept. **2017**) on file with counsel reflect the superintendent's public nondiscrimination statement and staff training follow-up regarding gender on school transportation. *(Non-adjudicated factual background; offered to illustrate administrative response rather than to prove liability.)*

[33] **Title IX baseline. 20 U.S.C. § 1681(a)** (no sex discrimination in education programs receiving federal funds). See also *Doe v. Boyertown Area Sch. Dist.*, **897 F.3d 518, 533–36** (3d Cir. **2018**) (upholding policy allowing transgender students to use facilities consistent with gender identity; rejecting privacy/hostility claims).

policies singling out transgender students for different treatment are unlikely to survive **Title IX/Equal Protection** scrutiny, while policies ensuring equal participation are lawful.[34] New York layers on additional protections through the **Dignity for All Students Act (DASA)** and the **Human Rights Law (as amended by GENDA)**, both of which require schools and public accommodations to avoid gender-identity discrimination and to maintain safe, supportive environments.[35]

## VII. TARGET: GENDER IDENTITY & EXPRESSION

Recent litigation shows that **compelled-speech** pronoun policies and "one-size-fits-all" rules produce **mixed, expensive** outcomes—sometimes favoring educators' speech/faith claims, other times favoring institutional policies—underscoring the risk of **arbitrary** enforcement when commissions wield broad discretion.

In **Meriwether v. Hartop** (6th Cir. 2021), a public-university professor disciplined for declining to use a student's pronouns plausibly alleged **First Amendment** (academic-speech) and **Free Exercise** violations; the Sixth Circuit **reversed dismissal** and allowed those claims to proceed.[36] In **Vlaming v. West Point School Board** (Va. 2023), the Virginia Supreme Court revived a high-school teacher's state constitutional and statutory claims after he was terminated for pronoun-related reasons; the case

---

[34] **Transgender student treatment under Title IX / Equal Protection.** *Grimm v. Gloucester Cnty. Sch. Bd.*, **972 F.3d 586, 616–19** (4th Cir. **2020**), **cert. denied**, 141 S. Ct. 2878 (2021) (bathroom policy excluding transgender boy violated **Title IX** and **Equal Protection**) (pins **616–19**); *Whitaker v. Kenosha Unified Sch. Dist. No. 1*, **858 F.3d 1034, 1044–50** (7th Cir. **2017**) (preliminary injunction for transgender boy; likelihood of success on Title IX/Equal Protection) (pins **1044–50**).

[35] **New York protections. DASA**, **N.Y. Educ. Law §§ 10–18** (school climate; bullying/harassment protections applicable to gender identity); **N.Y. Exec. Law § 296** (New York Human Rights Law) as amended by **GENDA**, L. **2019**, ch. **8** (explicitly protects **gender identity or expression** in public accommodations/education). See also **NYSED**, *Guidance to School Districts for Creating a Safe and Supportive School Environment for Transgender and Gender Nonconforming Students* (July **2015**) (administrative best-practices document).

[36] *Meriwether v. Hartop*, **992 F.3d 492, 503–12** (6th Cir. **2021**) (reversing dismissal; professor plausibly alleged **First Amendment** academic-speech and **Free Exercise** claims arising from pronoun discipline).

Page **12** of **35**

later resolved with a **$575,000** payment—illustrating the taxpayer exposure that can follow aggressive enforcement.[37]

Other courts have reached different results when schools show **undue hardship** or **disruption** from proposed accommodations. In **Kluge v. Brownsburg Community School Corp.** (7th Cir. 2023), the court affirmed judgment for the school under **Title VII**, holding that a "last-names-only" accommodation created **undue hardship** in the classroom environment. *Kluge v. Brownsburg Cmty. Sch. Corp.*, **64 F.4th 861, 872–79** (7th Cir. **2023**) (**Title VII**: accommodation created **undue hardship** in the educational setting; judgment for school). And in **Ricard v. Geary County USD 475** (D. Kan. 2022), a teacher disciplined for declining to use certain pronouns obtained **preliminary relief** and later settled—again demonstrating that even small wording choices can escalate into litigation with real fiscal consequences.[38]

Outside education, attempts to **criminalize** or penalize "misgendering" have also drawn constitutional limits. In **Taking Offense v. State of California** (2021), the California Court of Appeal struck down a statute that made "willful and repeated" misgendering a misdemeanor in long-term-care facilities, holding the provision **unconstitutional** compelled speech.[39]

**Net effect:** Where **neutral-sounding** rules are backed by **discretionary** enforcement (discipline, fines, training mandates), jurisdictions face **costly, inconsistent** results. A local HRC with open-ended power over speech-adjacent disputes risks **arbitrary outcomes** and **avoidable liability**—precisely the structural defect at issue here.

\

---

[37] *Vlaming v. West Point Sch. Bd.*, **887 S.E.2d 217, 239–45** (Va. **2023**) (reversing dismissal and remanding teacher's state constitutional/statutory claims); see also public settlement reports reflecting a **$575,000** payment resolving the case.

[38] *Ricard v. Geary Cnty. USD 475*, No. **5:22-cv-04015** (D. Kan. **2022**) (order granting preliminary relief; case later settled) (docket and orders on file with counsel).

[39] *Taking Offense v. State of California*, **66 Cal. App. 5th 696, 713–24** (Cal. Ct. App. **2021**) (invalidating criminal-misgendering provision as **unconstitutional** compelled speech).

## VIII. TARGET: SEXUAL ORIENTATION

Funding conditions and public-accommodations enforcement around **LGBTQ-related expression** show how "neutral" rules can be used to **pressure content and inventory** decisions when officials retain **open-ended discretion**. In **California**, **AB 1887 (2016)** restricts **state-funded travel** to jurisdictions deemed discriminatory on LGBTQ grounds—illustrating how broad "inclusivity" mandates can be leveraged through fiscal controls.[40] At the federal level, **NEA v. Finley** sustained a facially broad "decency and respect" criterion for arts funding but warned that the government may not wield funding criteria as a **pretext for viewpoint discrimination**—a caution that becomes acute when enforcement is discretionary.[41]

In the public-accommodations space, outcomes are mixed and **costly**. In **Masterpiece Cakeshop v. Colorado Civil Rights Commission**, the Supreme Court set aside state sanctions because officials displayed **religious hostility**, violating **Free Exercise**; the decision underscores that civil-rights enforcement must be neutral, even in cases involving **sexual-orientation discrimination**.[42] In **303 Creative LLC v. Elenis**, the Court held that a state could not **compel** a designer to create custom speech contrary to her beliefs—recognizing **compelled-speech limits** within public-accommodations regimes.[43] By contrast, state courts have upheld enforcement where neutrality is shown: **Ingersoll v. Arlene's Flowers** sustained liability under

---

[40] **AB 1887 travel-funding restriction. Cal. Gov't Code § 11139.8** (prohibits state-funded travel to states with enumerated anti-LGBTQ laws; statewide fiscal control mechanism).

[41] **Funding criteria & viewpoint risks.** *Nat'l Endowment for the Arts v. Finley*, **524 U.S. 569, 583–86** (1998) (upholding facial validity of decency/respect factor while emphasizing limits to avoid viewpoint discrimination in arts funding).

[42] **Neutrality in civil-rights enforcement (religious hostility).** *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, **138 S. Ct. 1719, 1729–32** (2018) (Free Exercise violated by commission's hostility; public-accommodations enforcement must be **neutral**).

[43] **Compelled-speech limit in PA laws.** *303 Creative LLC v. Elenis*, **600 U.S. ___**, slip op. at **14–20** (2023) (state cannot compel designer's custom expressive content; First Amendment protects against compelled speech in public-accommodations context).

Washington's public-accommodations law for refusing service for a same-sex wedding, and Oregon's long-running **Sweet Cakes** dispute confirms that—even amid constitutional limits—agencies may seek remedies, though **hostility** or **lack of neutrality** will trigger reversal or remand.[44]

**Net effect:** When "neutral" rules are administered by officials with **discretionary levers** (exemptions, funding conditions, ad-hoc penalties), enforcement can oscillate between permissive and punitive—precisely the **arbitrariness** a county HRC with quasi-judicial powers would magnify. **Fulton** makes the structural point: once a policy allows **case-by-case exemptions**, it is not **generally applicable**, and selective enforcement fails neutrality.[45]

---

## IX. TARGET: GENETIC INFORMATION

---

Existing federal and state frameworks already regulate disputes that get framed through **diet, belief, or biological/health attributes**—often without any need for a local tribunal. In employment, the **Genetic Information Nondiscrimination Act (GINA)** bars employers from acquiring or using **genetic information** (including family medical history) in hiring, firing, or conditions of employment.[46] Title VII and state analogues likewise require **reasonable accommodation** of sincere religious observance (including dietary practice), and after **Groff** the bar for "undue hardship" is

---

[44] **Enforcement sustained vs. constrained.**
• *Ingersoll v. Arlene's Flowers, Inc.*, **441 P.3d 1203, 1210–11, 1220–21** (Wash. 2019), **cert. denied**, 141 S. Ct. 2884 (2021) (liability under Washington's public-accommodations law).
• *Klein v. Or. Bureau of Labor & Indus.* ("Sweet Cakes"), **289 Or. App. 507, 410 P.3d 1051, 1061–67** (2017) (affirming BOLI liability; remanded damages), **rev'd & remanded**, **370 Or. 168, 515 P.3d 321, 336–43** (2022) (remanding to BOLI to reconsider damages in light of *Masterpiece* and neutrality requirements).

[45] **Discretionary exemptions defeat neutrality.** *Fulton v. City of Philadelphia*, **141 S. Ct. 1868, 1877–79** (2021) (policy not generally applicable where officials retained **discretionary exemptions**; selective, ad-hoc enforcement triggers strict scrutiny).

[46] **GINA (employment).** 42 U.S.C. **§§ 2000ff–2000ff-11** (Title II) (prohibiting acquisition/use of **genetic information**—including family medical history—in employment decisions; limits on employer inquiries and confidentiality).

materially higher than the old *Hardison* gloss.[47] In institutional settings, courts regularly police diet-accommodation under **RLUIPA** and the **Free Exercise Clause**, recognizing claims for **kosher/halal/vegetarian** diets when officials cannot justify denial; civil remedies exist without a new county commission.[48] At the pleading stage, U.S. courts have also treated **ethical veganism** as potentially **religious** under Title VII, while the U.K.'s *Casamitjana* decision recognized **ethical veganism** as a protected **philosophical belief**—showing that existing law already has tools to address diet- and belief-based claims.[49]

These frameworks sit alongside longstanding limits on government favoritism in religious scheduling. In **Estate of Thornton v. Caldor**, the Supreme Court struck down a statute granting an **absolute** Sabbath exemption, cautioning that privileging religion "over all other interests" violates the Establishment Clause.[50] Put together, the tension is managed **in court**: **too little** accommodation can violate Free Exercise/RLUIPA/Title VII; **too much** compelled deference can violate the Establishment Clause. Injecting an **extrajudicial** county commission with open-ended enforcement discretion—paired with expanded categories like **"genetic information"**—invites **arbitrary** outcomes (e.g., penalizing a menu theme as "favoring" religion or dietary identity) and **compelled-speech** risks in advertising or

---

[47] **Religious accommodation (employment).** *Groff v. DeJoy*, **143 S. Ct. 2279, 2294–95** (2023) (undue hardship requires **substantial increased costs** in relation to the conduct of the business); cf. *Trans World Airlines, Inc. v. Hardison*, **432 U.S. 63** (1977) (now read through *Groff*'s clarified standard).

[48] **RLUIPA / Free Exercise diet cases.** *Koger v. Bryan*, **523 F.3d 789, 798–805** (7th Cir. 2008) (RLUIPA violation for denying vegetarian diet to adherent; strict scrutiny applies); *Moussazadeh v. Tex. Dep't of Crim. Justice*, **703 F.3d 781, 792–96** (5th Cir. 2012) (RLUIPA claim over kosher meals; remand for strict-scrutiny analysis); *McElyea v. Babbitt*, **833 F.2d 196, 198–99** (9th Cir. 1987) (prisoners "have the right to be provided with food sufficient to sustain them… and with a diet sufficient to satisfy the dietary laws of their religion").

[49] **Veganism as protected belief.** *Chenzira v. Cincinnati Children's Hosp. Med. Ctr.*, No. **1:11-cv-00917**, 2012 WL 6721098, at *3–4 (S.D. Ohio Dec. 27, 2012)* (denying MTD; plaintiff's **veganism** could qualify as a **religious** belief at the pleading stage); *Casamitjana v. League Against Cruel Sports* [2020] **ET/3331129/2018** (U.K. Emp't Trib.) (ethical veganism recognized as a protected philosophical belief under the Equality Act 2010).

[50] **Establishment-Clause limit on absolute religious deference.** *Estate of Thornton v. Caldor, Inc.*, **472 U.S. 703, 708–10** (1985) (invalidating statute that required employers to accommodate Sabbath observance **without regard** to burden on employer or employees).

labeling, the very concerns the Court has flagged in commercial-speech and neutrality cases.[51]

**Bottom line:** There is **no remedial gap** here; federal and state law already adjudicate these claims. What Delco's ordinance adds is **unbounded discretion**—subpoenas, hearings, fines, and **mandatory exhaustion** before reaching court—creating precisely the **due-process, neutrality, and compelled-speech** problems the Constitution forbids.

## X. TARGET: MARITAL STATUS

Courts and regulators have long treated **advertising categories** that prefer one family model or sex as **actionable discrimination**. In **Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations**, the Supreme Court upheld a city ban on **sex-segregated "Help Wanted—Male/Female"** ads, confirming that entrenched industry formats in **commercial advertising** can be reclassified as unlawful bias.[52] In **New York City**, the **NYC Human Rights Law** prohibits discrimination (and **discriminatory advertising**) in **public accommodations** on protected bases—**including marital status**—and the Commission has authority to impose penalties and corrective measures when promotions or signage imply preference or exclusion.[53]

---

[51] **Commercial-speech / neutrality context.** *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rel.*, **413 U.S. 376, 388–91** (1973) (upholding ban on sex-segregated help-wanted ads; commercial-speech regulation must be neutral and tied to unlawful conduct); see also *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, **138 S. Ct. 1719, 1729–32** (2018) (civil-rights enforcement must be **neutral** toward religion).

[52] *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rel.*, **413 U.S. 376, 388–91** (1973) (upholding ban on "Help Wanted—Male/Female" columns; discriminatory help-wanted ads not protected commercial speech).

[53] N.Y.C. Admin. Code **§ 8-107(4)** (public accommodations), **§ 8-107(5)** (advertising), and **§ 8-107(1)(a)** (employment) (prohibiting discrimination and **discriminatory advertising**; "marital status" is a protected category).

Housing law is even clearer: the **Fair Housing Act** makes it unlawful to **publish any advertisement** that indicates a **preference, limitation, or discrimination** (e.g., "**no children**," "adults only"), and HUD's regulation lists such phrases as examples of **discriminatory advertising**.[54] Public-accommodation **gender-based pricing** and promotional schemes have likewise been struck down: the California Supreme Court invalidated "**Ladies' Day/Night**" discounts as unlawful sex discrimination under the **Unruh Act**, a reasoning mirrored in other jurisdictions' public-accommodation regimes.[55] **D.C. law** similarly bars discrimination in public accommodations— including **marital status**—demonstrating that existing statutes already regulate these practices without a county star-chamber.[56]

Employment doctrines also caution that **seemingly neutral family-favoring practices** (e.g., **word-of-mouth hiring** within a family network) are not per se lawful if they operate as a **proxy** for protected-class exclusion. While **nepotism** itself is not automatically prohibited by Title VII, courts have recognized that **insular recruitment** and "in-group" preferences can **perpetuate** unlawful national-origin or sex disparities absent a legitimate, job-related rationale.[57]

**Net effect:** When officials retain **open-ended discretion** over "traditional" or "family-friendly" branding, **marital/familial-status** cues, or sex-based promotions, enforcement can **swing** between permissive and punitive. As **Fulton** teaches, once a code allows **case-by-case exemptions**, it is not **generally applicable** and invites

---

[54] **Fair Housing Act**: 42 U.S.C. **§ 3604(c)** (prohibiting any notice/statement/advertisement indicating a **preference, limitation, or discrimination**); **HUD** Reg.: **24 C.F.R. § 100.75(b), (c)(3)** (examples include "**no children**," "**adults only**," "**couples only**").

[55] *Koire v. Metro Car Wash*, **40 Cal. 3d 24, 35–39** (Cal. 1985) (sex-based discounts violate **Unruh**); *Angelucci v. Century Supper Club*, **41 Cal. 4th 160, 167–73** (Cal. 2007) (male patrons may sue over higher cover charges; no pre-complaint demand required).

[56] **D.C. Human Rights Act:** D.C. Code **§ 2-1402.31** (unlawful discrimination in public accommodations, including **marital status**).

[57] *EEOC v. Consol. Serv. Sys.*, **989 F.2d 233, 236–38** (7th Cir. 1993) (Korean-owned employer's **word-of-mouth** hiring not per se unlawful but can perpetuate **national-origin** disparities; Title VII analysis turns on intent/impact and business justification).

**arbitrary** outcomes—exactly the structural risk posed by a county HRC with **quasi-judicial** powers.[58]

---

## XI. TARGET: FAMILIAL STATUS

---

Existing law already regulates **familial-status** and family-coded messaging—especially in **housing advertising**, where federal and state rules are clear. The **Fair Housing Act (FHA)** makes it unlawful to **publish any advertisement** that indicates a **preference, limitation, or discrimination** (e.g., "**no children**," "**adults only**"), and HUD's regulation lists such phrases as examples of **discriminatory advertising**; "familial status" (presence of children under 18, pregnancy, or custody) is a defined, protected category.[59] Courts have applied these provisions for decades, and the **Pennsylvania Human Relations Act (PHRA)** likewise bars **familial-status discrimination in housing**, leaving no gap for a county tribunal.[60]

In **public accommodations**, jurisdictions already scrutinize **sex- or age-based promotions** that exclude non-target customers. California's **Unruh Civil Rights Act** has long prohibited **"Ladies' Night/Day"** pricing, and state courts allow damages suits by excluded patrons.[61] Other jurisdictions police **age-tiered pricing** or "family-only" promotions under local public-accommodations law, particularly where pricing or

---

[58] *Fulton v. City of Philadelphia*, **141 S. Ct. 1868, 1877–79** (2021) (policy not generally applicable where officials retain **discretionary exemptions**; selective, ad-hoc enforcement fails neutrality and triggers strict scrutiny).

[59] **FHA advertising & familial status.** 42 U.S.C. **§ 3604(c)** (unlawful to make/publish any notice/statement/advertisement indicating a **preference, limitation, or discrimination**); **24 C.F.R. § 100.75(b), (c)(3)** (illustrative phrases include "**no children**," "**adults only**," "**couples only**"); **42 U.S.C. § 3602(k)** (defining **familial status**).

[60] **PHRA—housing.** 43 P.S. **§ 955(h)** (unlawful discriminatory housing practices, including **familial status**); see also enforcement under the FHA and PHRA against "**no children**" ads.

[61] **Sex-based promotions in public accommodations.** *Koire v. Metro Car Wash*, **40 Cal. 3d 24, 35–39** (Cal. 1985) (sex-based discounts violate **Unruh Act**); *Angelucci v. Century Supper Club*, **41 Cal. 4th 160, 167–73** (Cal. 2007) (male patrons may sue over higher cover charges; no pre-complaint demand required).

advertising **signals exclusion** to a protected class. The **commercial-speech** backdrop is also settled: long-standing industry formats in ads can be reclassified as unlawful bias, as the Supreme Court confirmed when it upheld a city ban on **sex-segregated "Help Wanted—Male/Female"** columns.[62]

**Bottom line:** there is **no remedial gap** to fill. Housing and public-accommodations regimes already regulate familial-status signals and exclusionary promotional practices. What a county HRC with **unbounded discretion** adds is the risk of **arbitrary over-read**—e.g., treating ordinary "family-friendly" branding or kids' specials as unlawful favoritism—creating the very **due-process and speech** problems the Constitution forbids.

---

## XII. TARGET: EDUCATIONAL STATUS

---

Existing federal and state frameworks already regulate disputes that get framed through **credentials, expertise, or academic speech**—without the need for a local tribunal. **Licensing boards** have tested the outer limits of speech regulation, but recent cases confirm that **public commentary about technical topics** is protected: Oregon's engineering board fined an individual for publicly critiquing **traffic-signal timing math**; a subsequent federal injunction/settlement recognized that discussing engineering principles **is protected speech** even if the speaker is not licensed as an "engineer."[63] On the accessibility side, **ADA Title II/III** already requires **effective communication** by public entities and places of public accommodation, addressing the

---

[62] **Commercial-speech / discriminatory ad formats.** *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rel.*, **413 U.S. 376, 388–91** (1973) (upholding ban on **"Help Wanted—Male/Female"** columns; discriminatory help-wanted advertising not protected).

[63] **Protected commentary on technical subjects / Oregon board.** See **Consent Judgment & Injunction**, *Järlström v. Oregon Bd. of Exam'rs for Eng'g & Land Surveying*, No. **3:17-cv-00652** (D. Or. Dec. 2018) (on file with counsel) (enjoining enforcement that penalized public discussion of traffic-signal timing math); cf. **U.S. Const. amend. I** (public debate on matters of policy/engineering is protected speech).

very concerns sometimes used to justify "clarity" mandates for public meetings—again, without creating new speech-policing commissions.[64]

Credential screens can also trigger **employment** liability if they function as **proxies** for protected-class exclusion. Under **Title VII**, the Supreme Court's **disparate-impact** doctrine requires employers to **validate** diploma/credential rules that disproportionately screen out protected groups; the **EEOC's Uniform Guidelines** reinforce that selection procedures must be **job-related and consistent with business necessity**.[65] In higher-education placement, states have addressed "barrier" prerequisites legislatively rather than through ad-hoc enforcement: **California's AB 705 (2017)**—now codified in **Educ. Code § 78213**—requires community colleges to **place students into transfer-level English/Math** using multiple measures and to justify remedial prerequisites, a policy choice enforced through the existing statewide system, **not** county tribunals.[66]

Academic-speech disputes are likewise handled under established **First Amendment/public-employee** standards. **Pickering** protects public-employee speech on matters of public concern—balanced against disruption; **Garcetti** limits protection for speech made **pursuant to official duties**; and the Third Circuit's **Munroe** decision underscores that even off-duty speech may be disciplined when a district makes a **supported disruption showing**.[67] Where identity policies intersect

---

[64] **Effective-communication duties (no new commission needed). 28 C.F.R. § 35.160** (Title II: public entities must ensure **effective communication**); **28 C.F.R. § 36.303** (Title III: auxiliary aids/services to ensure effective communication by places of public accommodation).

[65] **Credential screens & disparate impact.** *Griggs v. Duke Power Co.*, **401 U.S. 424, 431–36** (1971) (high-school diploma/test requirements unlawful absent business necessity; established **disparate-impact** doctrine); **29 C.F.R. pt. 1607** (EEOC **Uniform Guidelines on Employee Selection Procedures**—validation standards).

[66] **Legislative approach to prerequisites (CA). Cal. Educ. Code § 78213** (AB 705) (default placement into **transfer-level** English/math; colleges must use **multiple measures** and justify remedial prerequisites).

[67] **Academic/public-employee speech.** *Pickering v. Bd. of Educ.*, **391 U.S. 563, 568–75** (1968) (public-concern balancing); *Garcetti v. Ceballos*, **547 U.S. 410, 421–22** (2006) (speech **pursuant to official duties** not protected); *Munroe v. Cent. Bucks Sch. Dist.*, **805 F.3d 454, 466–72** (3d Cir. **2015**) (affirming discipline where record showed **disruption** from teacher's blog posts).

with classroom practice, outcomes are **mixed and costly**: some courts allow **speech/free-exercise** claims (e.g., *Meriwether*), while others find **undue hardship/disruption** (e.g., *Kluge*).[68] The point is not under-enforcement; it is that **courts already adjudicate** these conflicts under **settled doctrines**.

**Bottom line:** There is **no gap** for a county HRC to fill. Federal and state regimes already police **credential screens, accessibility duties, and academic/public-employee speech**. Handing a partisan HRC **unbounded discretion** over "educational status" risks **arbitrary over-read** (e.g., punishing technical vocabulary as "exclusionary," or stretching credential preferences into protected-class bias) and **speech-policing** far beyond what the Constitution allows.

---

## XIII. TARGET: DISABILITY

---

Existing federal law already governs disputes framed through **disability access**—without any need for a county star-chamber. **Title II** and **Title III** of the **ADA** require public entities and places of public accommodation to make **reasonable modifications** and ensure **effective communication** (e.g., interpreters, auxiliary aids) unless doing so would fundamentally alter the service or impose undue burdens.[69] DOJ regulations also define and protect **service animals** (and, in limited cases, **miniature horses**) and require reasonable accommodation for their use, again under established standards.[70] Courts enforce these duties directly: for example, in *Anderson v. City of Blue Ash* the Sixth Circuit allowed a family's ADA claims to proceed where a city's ordinance had the effect of **denying access** to a child's disability-related animal;

---

[68] **Mixed outcomes in identity-policy disputes.** *Meriwether v. Hartop*, **992 F.3d 492, 503–12** (6th Cir. **2021**) (professor plausibly alleged **First Amendment/Free Exercise** violations); *Kluge v. Brownsburg Cmty. Sch. Corp.*, **64 F.4th 861, 872–79** (7th Cir. **2023**) (**Title VII**: "last-names-only" accommodation caused **undue hardship** in the classroom).

[69] **Reasonable modifications / effective communication. 28 C.F.R. § 35.130(b)(7)** (Title II—modifications); **28 C.F.R. §§ 35.160, 36.303** (effective communication under Titles II & III).

[70] **Service animals / miniature horses. 28 C.F.R. §§ 35.136, 36.302(c)** (service animals); **28 C.F.R. § 35.136(i)** (miniature horses).

and in *PGA Tour v. Martin*, the Supreme Court required a reasonable modification (golf cart use) where the accommodation would not fundamentally alter the competition.[71]

**Bottom line:** There is **no remedial gap** to justify a new county commission with subpoena/hearing/fine power. When disability issues arise, the ADA's **existing, judicially-enforced** framework already provides the right standards and remedies— while an open-ended county HRC would add **arbitrary, speech-adjacent** risks and **mandatory exhaustion** that the Constitution does not permit.

---

## XIV. TARGET: SOURCE OF INCOME / PAYMENT METHODS

---

Source-of-income discrimination is already regulated—and **heavily enforced**—by existing agencies, producing multi-million-dollar outcomes **without** any county tribunal. In **Washington, D.C.**, the Attorney General secured a **$10 million** civil-penalty settlement against property managers for a **pattern** of discouraging voucher users; the consent order imposes extensive injunctive terms and professional sanctions.[72] In **New York City**, the **NYC Commission on Human Rights** reached a **$1 million** settlement and compliance plan with **Parkchester Preservation Management** over voucher-holder discrimination, alongside affirmative set-asides and training mandates.[73] **New York State** and other jurisdictions have continued

---

[71] *Anderson v. City of Blue Ash*, **798 F.3d 338, 356–59** (6th Cir. 2015) (reversing dismissal of ADA/Rehab Act claims tied to child's animal and municipal enforcement); *PGA Tour, Inc. v. Martin*, **532 U.S. 661, 682–90** (2001) (reasonable modification required where no fundamental alteration).

[72] **D.C. $10M consent order (voucher discrimination). OAG-DC** press release (Oct. 20, 2022) (largest civil penalty in U.S. housing discrimination case); **Consent Order** in *District of Columbia v. DARO Mgmt. Servs. et al.*, No. **2022-CA-001*** (D.C. Super. Ct. Oct. 17, 2022).

[73] **NYC—Parkchester settlement.** NYC Mayor's Office / **CCHR** release (Aug. 22, 2024) (announcing **$1,000,000** penalties and affirmative relief); see also local reporting.

administrative resolutions against landlords who impose "guarantor" or income hurdles on voucher holders—inconsistent with source-of-income protections.[74]

Separately, several cities and states regulate **cashless retail**, imposing civil penalties on businesses that refuse to accept cash—another example of **payment-method** rules already managed by existing enforcement bodies. **New York City** prohibits cashless stores (first violation typically **$1,000**, subsequent **$1,500**, enforced by DCWP).[75] **Philadelphia** enacted a **2019** cash-acceptance requirement with penalties administered through its Code and regulations; **New Jersey** adopted a statewide cash-acceptance law with **civil fines** beginning at **$2,500**.[76]

**Net effect:** Where policymakers believe additional protections are needed (vouchers, payment methods), they enact **targeted statutes** and empower **existing agencies**— no new county HRC with quasi-judicial powers is required. Indeed, the biggest risks come from **discretionary over-reach**: when officials wield open-ended authority (exemptions, ad-hoc penalties), enforcement drifts into **arbitrary** outcomes—precisely the structural defect at issue here. That same drift appears in **economic-favoritism** rules for vendors: courts and city councils have struck or repealed **protectionist 250-/300-foot** food-truck buffers after constitutional challenges, recognizing that "neutral" proximity rules can operate as **anti-competitive barriers** rather than genuine welfare measures.[77]

---

[74] **NY State administrative resolutions. NYSDHR** "Source-of-Income Complaints Resolved (2024)" (administrative dispositions against landlords imposing unlawful hurdles on voucher users).

[75] **NYC cashless ban & penalties. NYC DCWP**: Prohibition of Cashless Establishments (law effective Nov. 19, 2020; enforcement and penalties noted); see also reporting summarizing fine levels (**$1,000/$1,500**).

[76] **Philadelphia & New Jersey cash-acceptance rules. Philadelphia Code § 9-1132** and **PCHR Reg. 8** (2019); **New Jersey** P.L. 2019, c. 147 (banning cashless retail; fines starting **$2,500**).

[77] **Food-truck proximity rules (economic favoritism). San Antonio** repealed its **300-foot** buffer after suit—city attorney called it "**not defensible**." See IJ case page & contemporaneous reporting (Nov. 2015). **Jacksonville, NC** litigation challenges **250-foot** buffers; appeals court revived the case; TRO granted against signage rules in 2025.

## XV. TARGET: AGE

Age-based perks and pricing—long treated as harmless marketing—are increasingly regulated through existing public-accommodations regimes, without any need for a county HRC with quasi-judicial powers. In **Washington, D.C.**, the **D.C. Human Rights Act (DCHRA)** bars **age** discrimination in **public accommodations**; recent litigation challenges "**young-adult**" ticket discounts as unlawful under that statute.[78] In **California**, the Court of Appeal held that **age-tiered pricing** for Tinder subscriptions stated a claim under the **Unruh Civil Rights Act**, reinforcing that **age-based price differentials** can trigger liability absent a valid statutory defense.[79] These frameworks mean that student, youth, and "young professional" promotions can be scrutinized **today** under existing law—no new county tribunal required.

When agencies or enforcers retain **case-by-case exemptions** or **open-ended discretion**, outcomes become **arbitrary**. The Supreme Court's decision in **Fulton v. City of Philadelphia** is instructive: once a policy allows **discretionary exemptions** for some but not others, it is not **generally applicable**, and selective enforcement **fails neutrality**.[80] That same neutrality problem would be amplified by a local HRC endowed with **subpoena, hearing, and fining** powers—creating a risk that ordinary, age-coded promotions (e.g., "young professional night," "under-30 discount") draw **ad hoc penalties** while similar campaigns are excused, depending on who is targeted.

---

[78] **D.C. public-accommodations / age:** D.C. Code **§ 2-1402.31(a)** (unlawful discriminatory practices in **public accommodations**); see also **DC OHR**, *Protected Traits under the DCHRA* (listing **age** as a protected trait in public accommodations) (Nov. 2019). For a current challenge, see *Older Baseball Fans v. Washington Nationals* (D.C. Super. Ct. filed Mar. **2024**) (class action alleging "21–39" discounts violate the DCHRA's **age** protections).

[79] **California—age-based pricing under Unruh:** *Candelore v. Tinder, Inc.*, **19 Cal. App. 5th 1138, 1143–46, 1152–57** (2018) (reversing dismissal; **age-tiered** subscription pricing actionable under **Unruh Act**).

[80] **Discretion defeats neutrality:** *Fulton v. City of Philadelphia*, **141 S. Ct. 1868, 1877–79** (2021) (policy not **generally applicable** where officials retained **discretionary exemptions**; selective, ad-hoc enforcement triggers strict scrutiny).

The constitutional defect is not under-enforcement of rights; it is **unbounded discretion**.

---

## XVI. TARGET: HEIGHT

---

Height/weight rules are already addressed by **existing civil-rights laws** and **safety codes**, not by ad-hoc county tribunals. At the state level, **Michigan's Elliott-Larsen Civil Rights Act** expressly prohibits discrimination based on **height or weight** across core domains, and has done so for decades.[81] Major cities have added parallel protections: **San Francisco** prohibits discrimination based on **weight or height**; **New York City** amended the **NYC Human Rights Law** in **2023** to make **height/weight** a protected trait in **employment, housing, and public accommodations**; and **Madison (WI)** bars discrimination based on **physical appearance**, expressly including **weight and height**.[82] **Washington, D.C.** likewise protects "**personal appearance**" under the DCHRA—an adjacent category agencies use to address appearance-based bias.[83]

On the **amusement-ride safety** side, height limits are governed by **state codes** and manufacturer specifications—**not** civil-rights commissions. For example, **New Jersey's Amusement Ride Safety Code** requires operators and riders to comply with **posted height/size restrictions**; the Department maintains **approved height lists**, and where manufacturers do not specify, the **default minimum** for

---

[81] **Michigan height/weight protections. Mich. Comp. Laws § 37.2202(1)(a)** (employment discrimination prohibited on the basis of, inter alia, **height** and **weight**); see also **Elliott-Larsen Civil Rights Act**, Act 453 of 1976 (as amended) (protecting height/weight in employment, housing, public accommodations).

[82] **Municipal protections. San Francisco Police Code, Art. 33** (prohibiting discrimination based on **weight or height**); **NYC Human Rights Law** height/weight amendment (effective **Nov. 26, 2023**) (coverage in employment, housing, public accommodations); **Madison, WI – Equal Opportunities Ordinance** (protecting **physical appearance**, defined to include **weight** and **height**).

[83] **D.C. "personal appearance." D.C. Code § 2-1402.21** and **OHR Enforcement Guidance: Personal Appearance** (trait protected in employment, housing, public accommodations).

"major/super" rides is **60 inches**.[84] The logic is safety-driven (manufacturer/engineering), not a proxy for bias. When commissions with **unbounded discretion** second-guess such standards, they risk **overriding safety determinations** and producing **arbitrary** outcomes.

The broader civil-rights baseline also cautions against content- or membership-based exclusions untethered to neutral standards. In **Roberts v. U.S. Jaycees**, the Supreme Court upheld Minnesota's ability to enforce its Human Rights Act against a private club's exclusionary membership categories, recognizing states' authority to regulate access in public-facing settings so long as enforcement is **neutral** and grounded in law.[85] That principle cuts both ways: **neutral, generally applicable** safety or access rules (e.g., manufacturer height limits) are respected; **discretionary, ad-hoc** overrides by a partisan commission are not. The constitutional defect with Delco's HRC is not under-enforcement of rights—it is the **open-ended discretion** (exhaustion, subpoenas, hearings, fines) that invites **arbitrary** departures from settled safety and commercial regimes.

---

## XVII. TARGET: WEIGHT

---

Several jurisdictions already regulate **weight/height** bias directly—without creating new county tribunals. **New York City** amended the **NYC Human Rights Law (NYCHRL)** in **2023** to add **height and weight** as protected traits in **employment, housing, and public accommodations**, with Commission guidance cautioning

---

[84] **Amusement-ride safety standards (height). N.J.A.C. 5:14A-3.2** (riders must comply with **posted warnings** including **height/size restrictions**); **N.J.A.C. 5:14A-2.2** (Department maintains **approved height restrictions**; **default minimum 60 inches** for major/super rides when manufacturer manual lacks a number). See also **Carnival-Amusement Ride Safety Act**, **N.J.S.A. 5:3-31 et seq.** (program purpose/authority).

[85] **State human-rights enforcement, generally applicable.** *Roberts v. U.S. Jaycees*, **468 U.S. 609, 623–30** (1984) (upholding application of Minnesota Human Rights Act to public-facing membership practices; enforcement must be **neutral** and **generally applicable**).

against adverse treatment in access, seating, pricing, or services based on body size.[86] **Michigan's Elliott–Larsen Civil Rights Act** has long prohibited discrimination on the basis of **height or weight** across core domains, and **San Francisco** has likewise outlawed discrimination on **weight or height** in employment, housing, and public accommodations.[87] These frameworks mean that complaints about body-size bias are already **actionable today**—no new county HRC with quasi-judicial powers is needed.

Separately, jurisdictions have moved away from **gendered service pricing** in public accommodations; **New York State's "pink-tax" law** forbids **gender-based pricing** for **substantially similar** goods **and services**, permitting differences only where tied to **time, difficulty, or cost**.[88] In practice, salons and retailers have shifted toward **neutral descriptors** (e.g., "short/medium/long hair" or **time-based** pricing) to comply with existing law—demonstrating that rule-of-law solutions already exist **without** assigning speech-policing discretion to a partisan commission.

**Bottom line:** There is **no remedial gap** here. Where body-size bias or gender-coded pricing arises, **existing statutes and agencies** already govern. What a local HRC with **unbounded discretion** would add is the risk of **arbitrary over-reads** of ordinary branding or menus (and speech-adjacent penalties), producing exactly the **due-process and neutrality** problems this case challenges.

---

[86] **NYC—height/weight protections & guidance.** N.Y.C. Admin. Code **§ 8-107(1)(a)** (as amended by Local Law **61** of **2023**) (adding **height** and **weight** as protected traits in employment, housing, public accommodations; effective **Nov. 26, 2023**); see **NYC Commission on Human Rights**, *Legal Enforcement Guidance on Height and Weight Discrimination* (2024) (advising against adverse treatment in **access, seating, pricing, or services** based on body size).

[87] **Michigan & San Francisco. Mich. Comp. Laws § 37.2202(1)(a)** (Elliott–Larsen Civil Rights Act—prohibiting employment discrimination based on **height/weight**); see also **MCL § 37.2302** (public accommodations) & **§ 37.2502** (housing). **San Francisco Police Code**, **Art. 33** (prohibiting discrimination based on **weight or height** in employment, housing, and public accommodations).

[88] **New York "pink-tax" ban for goods & services. N.Y. Gen. Bus. Law § 391-u(2)–(3)** (prohibiting **gender-based pricing** for **substantially similar** products **and services**; differences permitted if based on **time, difficulty, cost, or labor**; effective **Sept. 30, 2020**).

## XVIII. TARGET: VETERAN STATUS

Many jurisdictions **already protect veteran/military status** in **public accommodations**, making disputes actionable **without** creating a new county tribunal. In **New York State**, the **Human Rights Law** bars discrimination in public accommodations on the basis of **military status**; businesses may not deny services or advertise in ways that exclude or deter veterans.[89] Other public-accommodations regimes police **pricing and promotional** schemes that prefer or exclude categories of patrons, especially where those schemes map onto **sex** or **age**. California courts have long rejected "**Ladies' Night**" pricing under the **Unruh Act**, and the California Court of Appeal permitted a challenge to **age-tiered** subscription pricing in **Tinder**.[90] **D.C.'s** Human Rights Act likewise bans **age** discrimination in public accommodations and has been used to scrutinize "young-adult" discounts.[91]

These frameworks highlight the **discretion** problem: once officials hold **case-by-case exemptions** or **ad-hoc levers** to approve some promotions and punish others, enforcement becomes **arbitrary**. The Supreme Court's decision in **Fulton v. City of Philadelphia** makes the structural point—**discretionary exemptions** defeat **general applicability** and neutrality.[92] A county HRC endowed with **subpoena, hearing, and fining** powers risks treating ordinary goodwill promotions (e.g.,

---

[89] **Veteran/military status protected in public accommodations. N.Y. Exec. Law § 296(2)(a)** (unlawful to deny public accommodation or to advertise discriminatory limitations based on, inter alia, **military status**); **§ 292(21)** (defining "military status").

[90] **Sex-/age-based promotions already regulated.** *Koire v. Metro Car Wash*, **40 Cal. 3d 24, 35–39** (Cal. 1985) (sex-based discounts violate the **Unruh Act**); *Angelucci v. Century Supper Club*, **41 Cal. 4th 160, 167–73** (Cal. 2007) (permitting damages suits by excluded patrons); *Candelore v. Tinder, Inc.*, **19 Cal. App. 5th 1138, 1143–46, 1152–57** (2018) (age-tiered subscription pricing stated Unruh claim).

[91] **D.C. Human Rights Act—age in public accommodations.** D.C. Code **§ 2-1402.31(a)** (unlawful to make any distinction in **public accommodations** based on **age**, among other traits); see also **D.C. Office of Human Rights**, *Protected Traits* (listing **age** as a public-accommodation protection).

[92] **Discretion defeats neutrality.** *Fulton v. City of Philadelphia*, **141 S. Ct. 1868, 1877–79** (2021) (policy not **generally applicable** where officials retained **discretionary exemptions**; selective, ad-hoc enforcement triggers strict scrutiny).

"veterans eat free on Veterans Day") as unlawful while excusing parallel offers for other groups, or vice-versa, depending on who is targeted—creating precisely the **due-process** and **neutrality** defects challenged here.

**Bottom line:** There is **no remedial gap** to fill. Veteran/military-status protections, and the broader rules governing public-accommodations promotions, already exist and are enforced through **established law**. What a partisan HRC adds is **unbounded discretion**—and with it, **arbitrary, speech-adjacent** enforcement risk.

---

### XIX. TARGET: USE OF SUPPORT ANIMALS

---

The **ADA** already supplies detailed, **judicially enforceable** rules for service animals—without creating new county tribunals with subpoena/hearing/fine powers. Under **Title II** (public entities) and **Title III** (places of public accommodation), covered entities must permit **service animals** and make **reasonable modifications** unless the animal is **out of the handler's control**, **not housebroken**, or the modification would **fundamentally alter** the service or pose a **direct threat** to health or safety.[93] For **miniature horses**, the ADA requires a **case-by-case assessment** using four factors: **(1)** type/size/weight of the horse and whether the facility can accommodate; **(2)** whether the handler has sufficient control; **(3)** whether the horse is housebroken; and **(4)** whether the horse's presence compromises **legitimate safety requirements**.[94]

Courts apply these standards **without** any county commission. In **Anderson v. City of Blue Ash**, the Sixth Circuit emphasized that accommodation requests involving assistance animals must be evaluated **case by case** under the ADA/Rehabilitation Act;

---

[93] **General ADA service-animal rules / exclusions / defenses. 28 C.F.R. § 35.130(b)(7)** (reasonable modifications, Title II); **28 C.F.R. § 35.136(b)** (may exclude if animal is **out of control** or **not housebroken**); **28 C.F.R. § 36.302(c)(1)–(2)** (Title III service-animal access and exclusions); **28 C.F.R. § 35.139** & **§ 36.208** (**direct threat**); **28 C.F.R. §§ 35.130(b)(7), 36.302(a)** (**fundamental alteration** limits).

[94] **Miniature horse assessment factors. 28 C.F.R. § 35.136(i)** (Title II); **28 C.F.R. § 36.302(c)(9)** (Title III) (factors: **type/size/weight**, **handler control**, **housebroken**, **safety**).

municipal enforcement that ignores the statutory factors risks violating federal law.[95] The ADA framework thus already balances **access** with **safety**, **sightlines**, **crowd control**, and **facility constraints**—and it provides a direct judicial remedy if an entity gets that balance wrong.

**Bottom line:** There is **no remedial gap** to justify a local HRC with **unbounded discretion**. A county commission empowered to second-guess ADA balances (via **mandatory exhaustion**, **subpoenas**, **hearings**, and **fines**) would invite **arbitrary overrides** of neutral, **federally defined** standards—precisely the **due-process** and **neutrality** defects challenged here.

---

## XX. TARGET: SEXUAL VIOLENCE VICTIM STATUS

---

Federal frameworks already govern the tension between **survivor-specific safety** and **equality rules**—without creating new county tribunals. The **Violence Against Women Act (VAWA)** imposes a **nondiscrimination grant condition** on funded programs, prohibiting discrimination based on **sex, gender identity, sexual orientation,** and other traits, while allowing **sex-specific or sex-segregated programming** when consistent with the program's mission **and** when **comparable services** are provided to those excluded.[96] The **HUD Equal Access Rule** likewise requires HUD-funded shelters to provide access **consistent with a person's gender identity**, subject to ordinary, neutral safety limits (e.g., building capacity, program eligibility), thus balancing **safety** with **equal access** under an existing federal regime.[97]

---

[95] *Anderson v. City of Blue Ash*, **798 F.3d 338, 356–59** (6th Cir. 2015) (reversing dismissal; ADA/Rehab Act require **individualized assessment** for assistance-animal accommodation; municipal enforcement that disregards factors may violate federal law).

[96] **VAWA nondiscrimination grant condition; sex-specific programming. 34 U.S.C. § 12291(b)(13)** (formerly 42 U.S.C. § 13925(b)(13)) (prohibiting discrimination by VAWA-funded programs on the basis of sex, gender identity, sexual orientation, inter alia); **U.S. Dep't of Justice, Office on Violence Against Women (OVW)**, *FAQ on the VAWA Nondiscrimination Grant Condition* (2014 & updates) (sex-specific/sex-segregated programming permitted if consistent with program and **comparable services** offered to excluded individuals).

[97] **HUD Equal Access Rule (gender identity in shelters). 24 C.F.R. § 5.106** (access to HUD programs in accordance with an individual's **gender identity**; provider policies must be nondiscriminatory and safety-justified); see **81 Fed. Reg. 64763** (Sept. 21, 2016) (final rule).

In public accommodations more broadly, courts permit states to enforce nondiscrimination laws against exclusionary membership or access policies, so long as enforcement is **neutral** and **generally applicable**. In **Roberts v. U.S. Jaycees**, the Supreme Court upheld Minnesota's application of its Human Rights Act to a public-facing membership organization.[98] But **discretion** is the danger: **Fulton v. City of Philadelphia** teaches that once officials retain **case-by-case exemptions**, a policy ceases to be **generally applicable** and enforcement becomes **arbitrary**, failing neutrality.[99]

**Bottom line:** There is **no remedial gap** here. VAWA, HUD, and state public-accommodations laws already regulate survivor programs and shelters, with **judicial review** available if agencies get the balance wrong. Creating a county HRC with **mandatory exhaustion**, **subpoenas**, **hearings**, and **fines** would invite **ad-hoc overrides** of federal standards—precisely the **due-process** and **neutrality** defects challenged in this case.

---

## XXI. TARGET: FIREARM RIGHTS

---

The law already supplies **controlling constitutional and state frameworks** for firearms—no county HRC is needed to overlay quasi-judicial discretion. The Supreme Court recognizes an **individual** right to keep and bear arms (**Heller**), applies it to the **states** (**McDonald**), and requires that modern regulations accord with the Amendment's **text and historical tradition** (**Bruen**).[100] In **Pennsylvania**, the **Uniform Firearms Act** expressly **preempts** counties and municipalities from regulating "ownership, possession, transfer or transportation" of firearms, ammunition,

---

[98] **State enforcement of public-accommodations laws.** *Roberts v. U.S. Jaycees*, **468 U.S. 609, 623–30** (1984) (upholding application of Minnesota Human Rights Act; public-facing access may be regulated if enforcement is neutral and generally applicable).

[99] **Discretion defeats neutrality.** *Fulton v. City of Philadelphia*, **141 S. Ct. 1868, 1877–79** (2021) (policy not **generally applicable** where officials retained **discretionary exemptions**; selective, ad-hoc enforcement fails neutrality and triggers strict scrutiny).

[100] **Second Amendment baselines.** *District of Columbia v. Heller*, **554 U.S. 570, 592, 628–35** (2008) (individual right; core = defense of hearth and home); *McDonald v. City of Chicago*, **561 U.S. 742, 750–51, 791** (2010) (incorporation); *N.Y. State Rifle & Pistol Ass'n v. Bruen*, **142 S. Ct. 2111, 2122–30** (2022) (text-and-history test; invalidating "proper cause" discretion).

or ammunition components; the Pennsylvania Supreme Court enforced that limit in **Ortiz v. Commonwealth**, invalidating Philadelphia and Pittsburgh ordinances.[101]

Despite these settled rules, local actors sometimes attempt **administrative end-runs**—especially through **zoning**, **permitting**, or **facility rules**—to burden lawful firearms commerce and training. Federal courts have already addressed these tactics: the Third Circuit in **Drummond v. Robinson Township** held that severe burdens on shooting clubs/ranges trigger heightened scrutiny under the Second Amendment; the Seventh Circuit twice struck Chicago's efforts to ban or zone out ranges in **Ezell I** and **Ezell II**.[102] While other courts have been more deferential to certain retail restrictions (e.g., the Ninth Circuit's en banc decision in **Teixeira** found no stand-alone right to operate a gun store), the lesson is that courts—**not** county commissions—adjudicate these disputes under **constitutional standards**.[103]

**Net effect:** There is **no remedial gap** that justifies delegating **exhaustion, subpoenas, hearings, and fines** to a county HRC. A partisan commission could **re-characterize** range rules, club membership policies, store placement, or event advertising as "discriminatory practices," **chilling** lawful activity while **evading** the Second Amendment and Pennsylvania preemption. The constitutional defect here is **unbounded discretion**—not under-enforcement. When officials hold **ad-hoc levers**, enforcement becomes **arbitrary**, as **Fulton** teaches about neutrality and general

---

[101] **Pennsylvania preemption. 18 Pa.C.S. § 6120(a)** (local preemption); *Ortiz v. Commonwealth*, **681 A.2d 152, 156–57** (Pa. 1996) (municipalities are "creatures of the state" and may not regulate firearms contrary to § 6120).

[102] **Range/club burdens as 2A problems.** *Drummond v. Robinson Twp.*, **9 F.4th 217, 224–26, 230–36** (3d Cir. 2021) (heightened scrutiny for severe burdens on firearms training/club operations); *Ezell v. City of Chicago* ("Ezell I"), **651 F.3d 684, 704–11** (7th Cir. 2011) (prelim. inj.; range ban unconstitutional); *Ezell v. City of Chicago* ("Ezell II"), **846 F.3d 888, 892–900** (7th Cir. 2017) (striking range zoning/locational barriers).

[103] **Retail restrictions—mixed outcomes.** *Teixeira v. Cnty. of Alameda*, **873 F.3d 670, 673–77, 682–88** (9th Cir. 2017) (en banc) (no free-standing right to sell firearms, while noting the Second Amendment protects acquisition by law-abiding citizens).

applicability; the same principle warns against a county HRC empowered to second-guess neutral safety or land-use rules in the firearms context.[104]

---

## XXII. TARGET: ELECTION INTERITY

---

**Record example (Philadelphia).** In the **Savage v. Trump, Stenstrom, et al.** litigation, opposing counsel publicly and in filings portrayed Defendants' election-integrity advocacy and historical metaphors (the "**Boxes of Liberty**" speech trope) as "threats," even accusing them of "**threatening to use explosives**." The defense materials show the allegations were forcefully contested—pointing out the long-standing rhetorical use of "ballot box / jury box / cartridge box" across American history—and that counsel sought to block sanctions and other restraints on Defendants' ability to speak and petition about election oversight.[105] This illustrates how **speech-adjacent accusations** can be used to **recharacterize** core political advocacy as "harassment" or "incitement," burdening the **right to speak and to petition the courts**.

**No remedial gap to fill.** Existing law already regulates this space. **First Amendment** doctrine protects **private political advocacy** and requires **government neutrality** toward viewpoint; when government channels or processes (e.g., school P.A. systems, official boards) carry the **imprimatur of the state**, the neutrality rule bars state-endorsed speech, but it does not authorize **suppression** of private, lawful advocacy.[106] Likewise, Pennsylvania's **Right-to-Know Law (RTKL)**

---

[104] **Discretion defeats neutrality (structural caution).** *Fulton v. City of Philadelphia*, **141 S. Ct. 1868, 1877–79** (2021) (policy not generally applicable where officials retain **discretionary exemptions**; selective, ad-hoc enforcement fails neutrality and triggers strict scrutiny).

[105] **Philadelphia record (Savage v. Trump, Stenstrom, et al.).** *Stenstrom & Hoopes—Hearing Response (June 20, 2023)* (slides quoting opposing counsel's allegation that Defendants "threaten[ed] to use explosives," and documenting historical "Boxes of Liberty" usage) (on file).

[106] **Neutrality toward private religious/political expression; state-endorsed channels.** *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, **393 U.S. 503, 509, 514** (1969) (no suppression absent **material and substantial** disruption); *Santa Fe Indep. Sch. Dist. v. Doe*, **530 U.S. 290, 308–10** (2000) (state-amplified prayer violates neutrality); *Kennedy v. Bremerton Sch. Dist.*, **142 S. Ct. 2407, 2421–22** (2022) (government must remain **neutral** toward private exercise).

establishes a **complete, judicially reviewable** process for records disputes: request → agency response → **Office of Open Records** appeal → **Court of Common Pleas** review. A new county HRC with **mandatory exhaustion** would not "fill a gap;" it would **interfere with, delay, or chill** a statutorily defined path to court.[107]

**Discretion is the constitutional problem.** The Supreme Court's **Fulton** decision makes the structural point: once officials retain **case-by-case exemptions** or **ad-hoc levers**, a policy ceases to be **generally applicable**, and enforcement **fails neutrality**.[108] Courts have likewise enjoined **extra-judicial "committees"** that chill speech through discretionary complaint intake and "investigations" without adjudicative safeguards (e.g., campus **bias-response teams**), recognizing the **objective chill** such mechanisms impose on protected speech.[109] A county HRC with **subpoena, hearing, and fining** powers could **re-label** election-integrity speech, RTKL requests, or observer advocacy as "harassment," "threats," or "discrimination," **chilling oversight** while evading established constitutional and statutory forums.

**Bottom line:** There is **no remedial gap** that justifies delegating **quasi-judicial** control over election-integrity advocacy to a partisan HRC. The First Amendment, RTKL, and Article III/Article V courts already govern. What Delco's ordinance adds is **unbounded discretion**—and with it, **arbitrary, speech-adjacent enforcement** against citizens who question election practices—precisely the **facial due-process and neutrality** defects this case challenges.

---

[107] **Pennsylvania Right-to-Know Law (process complete; court review). 65 P.S. §§ 67.101–67.3104; § 67.1101** (appeals from agency responses to the **Office of Open Records**; judicial review available in the **Court of Common Pleas**).

[108] **Discretion defeats neutrality (general-applicability defect).** *Fulton v. City of Philadelphia*, **141 S. Ct. 1868, 1877–79** (2021) (policies with **discretionary exemptions** are not generally applicable; selective enforcement triggers strict scrutiny).

[109] **Extra-judicial "bias response" regimes—objective chill.** *Speech First, Inc. v. Schlissel*, **939 F.3d 756, 763–66** (6th Cir. **2019**) (university bias-response team plausibly chills speech; standing/injunction appropriate); *Speech First, Inc. v. Fenves*, **979 F.3d 319, 337–38** (5th Cir. **2020**) (similar chilling effect; remand for relief).

# EXHIBIT C

**Exhibit C – Anticipated Defenses and Rebuttals Chart**

| Defense Likely Raised | Plaintiff's Rebuttal | Controlling Authority |
|---|---|---|
| **Standing / Ripeness** – Injury speculative, no enforcement yet. | Injury arises immediately from mandatory exhaustion and partisan tribunal; plaintiff has direct, particularized harm. | *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992); *MedImmune v. Genentech*, 549 U.S. 118 (2007); see Memo §III. |
| **Political Question** – Local policy choice. | Determining constitutionality of laws under First & Fourteenth Amendments is core judicial function, never a political question. | *Baker v. Carr*, 369 U.S. 186 (1962); *Zivotofsky v. Clinton*, 566 U.S. 189 (2012); see Memo §IV. |
| **Rooker-Feldman** – Federal court lacks jurisdiction. | Plaintiff does not seek review of state judgments; challenges a new ordinance on its face. | *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280 (2005); see Memo §H.6. |
| **Pullman Abstention** – Unsettled state law. | PHRA is settled law; it does not authorize exhaustion or judicial powers for counties. | *Railroad Comm'n v. Pullman Co.*, 312 U.S. 496 (1941); *Pa. Rest. & Lodging Ass'n v. Pittsburgh*, 211 A.3d 810 (Pa. 2019); see Memo §H.6. |
| **Younger Abstention** – Ongoing state proceedings. | No proceeding exists; even if one did, bad faith/retaliation defeats Younger. | *Huffman v. Pursue, Ltd.*, 420 U.S. 592 (1975); see Memo §H.6. |
| **Ultra Vires Authority** – PHRA authorizes local commissions. | PHRA permits "similar," not "greater" powers. PHRC itself lacks exhaustion or judicial authority. | *Holt's Cigar Co. v. Philadelphia*, 10 A.3d 902 (Pa. Commw. Ct. 2011); PHRA, 43 P.S. §962.1; see Memo §VI.A. |

| Defense Likely Raised | Plaintiff's Rebuttal | Controlling Authority |
|---|---|---|
| **Separation of Powers** – County may delegate quasi-judicial roles. | Judicial power vested exclusively in courts; partisan appointees cannot wield subpoenas, fines, adjudication. | Pa. Const. art. V, §1; *Tumey v. Ohio*, 273 U.S. 510 (1927); *Ward v. Monroeville*, 409 U.S. 57 (1972); see Memo §VI.A–B. |
| **Due Process** – Commission provides adequate process. | Structural bias, lack of safeguards, compelled exhaustion = unconstitutional. | *Mathews v. Eldridge*, 424 U.S. 319 (1976); see Memo §VI.B. |
| **Access to Courts** – State remedies sufficient. | Denial of direct judicial access is itself a constitutional injury. | *Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982); *Christopher v. Harbury*, 536 U.S. 403 (2002); see Memo §VI.C. |
| **First Amendment Carve-Out** – Religious exemption protects speech. | Carve-out is selective, excludes political/artistic/cultural speech = viewpoint discrimination. | *303 Creative LLC v. Elenis*, 600 U.S. ___ (2023); *Masterpiece Cakeshop v. Colorado*, 138 S. Ct. 1719 (2018); *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750 (1988); see Memo §VI.D, H.4. |
| **Vagueness / Overbreadth** – Ordinance mirrors PHRA. | Expands categories ("height," "weight," "source of income") without standards; invites arbitrary enforcement. | *Grayned v. City of Rockford*, 408 U.S. 104 (1972); *Kolender v. Lawson*, 461 U.S. 352 (1983); see Memo §VI.F. |
| **Equal Protection** – Ordinance is facially neutral. | Vague categories + partisan discretion = discriminatory application. | *Yick Wo v. Hopkins*, 118 U.S. 356 (1886); see Memo §H.11. |

| Defense Likely Raised | Plaintiff's Rebuttal | Controlling Authority |
|---|---|---|
| **Retaliatory Purpose** – Ordinance neutral, not aimed at Plaintiff. | Ordinance follows years of defamation suits, sanctions, malicious prosecution, and media campaigns; retaliation actionable under §§1983, 1985, 1986. | *Mt. Healthy v. Doyle*, 429 U.S. 274 (1977); *Perry v. Sindermann*, 408 U.S. 593 (1972); see Memo §VI.E, Exhibit A. |
| **Facial vs. As-Applied** – Must wait for enforcement. | Facial challenges valid where law imposes unbridled discretion or structural barriers to rights. | *City of Lakewood*, 486 U.S. at 755–56; *MedImmune*, 549 U.S. at 128–29; see Memo §H.12. |
| **Severability** – Court can strike narrow provisions only. | Ordinance inseverable: exhaustion, subpoenas, adjudication are core functions; without them, Commission is a redundant advisory board. | *Alaska Airlines v. Brock*, 480 U.S. 678, 684 (1987); see Memo §H.13. |

# EXHIBIT D

## COUNTY OF DELAWARE PENNSYLVANIA

### ORDINANCE No. 2025-06

AN ORDINANCE OF THE COUNTY OF DELAWARE, COMMONWEALTH OF PENNSYLVANIA AMENDING ARTICLE XI (COUNCILMANIC SERVICE) OF THE DELAWARE COUNTY CODE AND ESTABLISHING A COUNTY HUMAN RELATIONS COMMISSION.

WHEREAS, pursuant to § 1-10 of the Code (the "Code") of the County of Delaware, Commonwealth of Pennsylvania (the "County"), the Code may be amended by ordinances of the County Council when passed and adopted in such form as to indicate the intention of the County Council to be a part of the Code; and

WHEREAS, pursuant to Section 12.1 of the Pennsylvania Human Relations Act, 43 P.S. § 962.1, the County is permitted to establish a Local Human Relations Commission, as well as its home rule police powers; and

WHEREAS, the County is opposed to the evils of discrimination in all of its forms, and especially in the areas of employment, housing, and education;

IT IS HEREBY ENACTED AND ORDAINED BY the County Council of Delaware County, Commonwealth of Pennsylvania as follows:

SECTION 1. Article XI (Councilmanic Service) of the Code is hereby amended to add a new Section 6-89 to read as set forth in Exhibit A attached hereto.

SECTION 2. Repealer. All ordinances or parts of ordinances which are inconsistent herewith are hereby repealed.

SECTION 3. Severability. If any action, paragraph, subsection, clause, or provision of this Ordinance shall be declared invalid or unconstitutional by a court of competent jurisdiction, including any part of Exhibit A attached hereto, such decision shall not affect the validity of this Ordinance as a whole or any part thereof, including Exhibit A, other than that portion specifically declared invalid.

SECTION 4. Effective Date. This Ordinance shall take effect on January 1, 2026.

ENACTED AND ORDAINED by County Council of the County of Delaware, Pennsylvania, this _____day of ___2025.

COUNTY OF DELAWARE

_____
Dr. Monica Taylor, Chair

_____
Richard R. Womack, Vice Chair

_____
Kevin M. Madden

_____
Elaine Paul Schaefer

_____
Christine A. Reuther

Attested:

_____
Sharon Scattolino County Clerk

"EXHIBIT A"

§ 6-89 **Local Human Relations Commission.**

A. **Establishment of Commission.** Pursuant to Section 12.1 of the Pennsylvania Human Relations Act, 43 P.S. § 962.1, there is hereby established a Human Relations Commission (the **"Commission"**) in and for the County of Delaware (the **"County"**).

B. **Definitions.** As used herein, the following terms shall be given the following meanings. Terms used herein that are defined in the Pennsylvania Human Relations Act, 43 P.S. § 951, *et seq.*, (the **"Act"**) shall have the meanings defined by the Act.

**Accessible.** An accommodation, building, real property, device, or other place or thing shall be 'accessible' where it is in compliance with all applicable provisions of (i) The Fair Housing Act, 42 U.S.C. § 3601, *et seq.*; (ii) the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.*; and (iii) the Pennsylvania Construction Code Act, 35 P.S. §7210.101, *et seq.*

**Advertiser.** Any person who places, publishes, broadcasts or similarly causes to be disseminated by any other means an advertisement or advertising as defined herein.

**Age.** Includes any person over the age of thirty-five (35) years and shall also include any other person so protected by further amendment to the Federal Age Discrimination in Employment Act.

**AIDS.** Acquired Immunodeficiency Syndrome.

**National origin or citizenship status.** Individuals protected by Section 1324b of the Immigration and Nationality Act, 8 U.S.C. §1324b.

**Commercial Property.** Any building, structure or facility, or portion thereof, which is used, occupied or is intended, arranged or designed to be used or occupied for the purpose of operating a business, an office, a manufactory or any public accommodation; and any vacant land offered for sale, lease or held for the purpose of constructing or locating thereon any such building, structure, facility, business concern or public accommodation.

**Commercial Housing.** Housing accommodations held or offered for sale or rent: (i) by a real estate broker, salesperson or agent or by any person pursuant

to authorization of the owner; or (ii) by the owner themself, or their legal representative, but shall not include either the rental of a room or rooms in a personal residence where the rental includes shared space in the personal residence.

**Common Carrier.**  Any person holding themselves out to the general public to provide transportation for compensation.

**Disability.** As defined by the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*, but such term does not include the current, illegal use of or addiction to a controlled substance, as defined in section 102 of the Controlled Substances Act, 21 U.S.C. §802.

**Educational Institution.** Any public or private education provider, charter school, college, university, trade or training school, pre-school, daycare provider, or other educational entity.

**Employee** An employee is an individual who works under the supervision or control of an employer

**Employer** Any person or organization who employs one or more employees, exclusive of parents, spouse, or children.

**Gender Expression.**  Any observable behaviors or physical characteristics of a person's hair, body, clothing, accessories, or otherwise, that signal or are associated with gender.

**Gender Identity.**  A person's perceived gender, whether self-perceived or as perceived by others.

**Genetic Information.**  That information which is defined as genetic information in the Genetic Information Nondiscrimination Act of 2008, 42 U.S.C. § 2000ff, *et seq.*

**Health Care Provider.** As defined by the Pennsylvania MCARE Act, 40 P.S. § 1303.101, *et seq.*

**HIV.** Human Immunodeficiency Virus, also referred to as HIV Disease. The spectrum of disease clinically associated with HIV infection, encompassing both the symptomatic and asymptomatic forms of the infection.

**Lending Institution.** Any bank, insurance company, savings and loan association, credit union, or any other person or organization regularly engaged in the business of lending money or guaranteeing loans.

**Licensed Common Carrier.** Includes transportation provided by buses, trolleys, taxis, limousines, and shuttles.

**Marital Status.** The status of being single, married, separated, divorced, widowed or a life partner.

**Ordinance.** This Ordinance.

**Owner.** Includes a lessee, sublessee, assignee, manager, agent, or any other person or organization having the right of ownership or possession or the authority to sell, rent or lease any housing accommodation, including political subdivisions and the County and its authorities, boards and commissions.

**Person or Organization.** Includes one or more individuals, a general or limited partnership, association, organization, for profit and not-for-profit corporation, sole proprietorship, limited liability company, legal representative, trustee in bankruptcy or receiver. It also includes, but is not limited to, any owner, lessor, assignor, builder, manager, broker, salesperson, agent, employee, independent contractor, volunteer, lending institution, political subdivision, and the County and its authorities, boards and commissions.

**Political Subdivision.** Any city, borough, incorporated town or township located within Delaware County.

**Protected Class.** The actual or perceived race, ethnicity, color, religion, creed, national origin or citizenship status, ancestry, sex (including pregnancy, childbirth, and related medical conditions), gender identity, gender expression, sexual orientation, genetic information, marital status, familial status, GED rather than high school diploma, physical or mental disability, relationship or association with a disabled person, source of income, age, height, weight, veteran status, use of guide or support animals and/or mechanical aids, or domestic or sexual violence victim status.

**Religion.** All aspects of religious observance and practice, as well as belief.

**Sex.** As used herein, the term "sex" shall be interpreted in its broadest sense, to include a person's sex genes, physical characteristics, gender, gender identity, gender expression, sexual orientation, pregnancy, breastfeeding status, or the perception of any of the foregoing.

**Sexual Orientation.** A person's emotional, romantic, or sexual attraction to others as limited, by others' sex.

**Source of Income.** Any lawful source of income, including but not limited to, earned income, child support, alimony, insurance and pension proceeds, unemployment insurance, social security, and all forms of public assistance, including social security disability insurance and supplemental security income, Temporary Assistance for Needy Families (TANF) and any successor legislation, and housing assistance programs.

C. **Unlawful Practices.** Discrimination against any person on the basis of their protected class is prohibited in the areas of employment, housing, public accommodation, access to educational institutions, and provision of healthcare.

D. **Employment Discrimination Protections.** The following actions are prohibited with regard to any employee or independent contractor who is a member of a protected class as defined herein:

1. An employer may not refuse, based on protected class, to hire or employ or contract with, or to bar or discharge from employment, or to otherwise discriminate against employees or independent contractors with respect to compensation, hiring, volunteering, tenure, terms, conditions or privileges of employment or contract.

2. An employment agency, employment service, labor organization, training school, or training center, or any other employee-referring source may not confine or limit recruitment or hiring of employees with intent to circumvent the spirit and purpose of this Ordinance.

3. An employer may not elicit any information or make or keep a record of, or use any form of application or application blank, containing questions or entries concerning the protected class of any applicant for employment. Nothing in this subsection shall preclude an employer from collecting demographic data after hiring so long as such information is voluntarily provided by the employee and its provision is not made a condition of employment.

4. A labor organization may not deny full and equal membership rights to any individual or group of individuals, or discriminate against such individuals with respect to hiring, tenure, terms, conditions or privileges of employment, participation in apprenticeship programs, or any other matter, directly or indirectly related to employment, because of protected class.

5.  An employer may not exclude or otherwise deny an employee or applicant for employment equal jobs or benefits because of the disability of an individual with whom an employee or applicant is known to have a relationship or association.

6.  An employer or labor organization, may not discriminate against any individual because that individual has made a charge, testified, or assisted in any manner in any discrimination investigation, proceeding or hearing under this Ordinance, or any other non-discrimination laws or regulations.

7.  An employer may not, directly or indirectly, prohibit, coerce or prevent any person from complying with the provisions of this Ordinance.

8.  An employment agency may not refuse to refer for employment, or otherwise discriminate against any individual because of protected class.

9.  An employer, employment agency, labor organization, or advertiser may not print or publish or cause to be printed or published any notice or advertisement relating to employment or membership, indicating any preference, limitation, specification or discrimination based upon protected class.

10. An employer may not ask, on an employment application, whether the applicant has ever been convicted of a crime. An employer may include in its job requirements that an applicant have a clean driving record or be able to pass a child abuse clearance check.  Notwithstanding the foregoing, the provisions of this Section shall not apply to any position which, by law, includes a requirement that employees must be free from conviction of any crime or specific crimes, but in such circumstances an employer shall inquire only into the limited set of crimes which are disqualifying for employment by law.

11. An employer may not require a job applicant to disclose prior criminal convictions until after an initial interview.  Notwithstanding the foregoing, the provisions of this Section shall not apply to any position which, by law, includes a requirement that employees must be free from conviction of any crime or specific crimes, but in such circumstances an employer shall inquire only into the limited set of crimes which are disqualifying for employment by law.

12. Employers are prohibited from considering conviction records which do not relate to an applicant's suitability for employment. After a first interview, employers may use background checks and prior history to determine suitability for employment. Notwithstanding the foregoing, the provisions of this Section shall not apply to any position which, by law, includes a requirement

that employees must be free from conviction of any crime or specific crimes, but in such circumstances an employer shall inquire only into the limited set of crimes which are disqualifying for employment by law.

13. An employer may not require, as a condition of employment, any employee to disclose their salary at another place of employment.

14. Nothing in this Ordinance shall prohibit any institution or organization for persons with disabilities from limiting or giving preference in employment or membership to disabled persons.

15. Nothing in this Ordinance shall require an employer to hire, promote or retain an employee who is not qualified or not able to perform the job for which they are applying or were hired to do.

E.  **Housing Discrimination Protections.**  A person or organization may not:

1.  Because of protected class refuse to sell, lease, finance, or otherwise to deny or withhold any housing accommodation or commercial property, or to refuse to furnish facilities, services, or privileges in connection with the ownership, occupancy, or use of any housing accommodation or commercial property, from any tenant, owner, prospective owner, occupant or user of such housing accommodation or commercial property.

2.  Evict or attempt to evict an occupant of any housing accommodation before the end of the term of a lease because of pregnancy or the birth of a child.

3.  Refuse to lend money, whether or not secured by mortgage or otherwise, for the acquisition, construction, rehabilitation, repair or maintenance of any housing accommodation or commercial property or otherwise withhold financing of any housing accommodation or commercial property from any person because of protected class.

4.  Refuse to permit, at the expense of a tenant, owner, renter, or legal occupant with a disability, reasonable modifications of existing premises occupied or to be occupied by such person if such modification may be necessary to afford such person full enjoyment of the premises, except that, in the case of a rental, the landlord may, where it is reasonable to do so, grant permission for a modification if the renter agrees to, at their expense, restore the premises to the condition that existed before the modification, with reasonable wear and tear excepted.

5.  Refuse to make reasonable accommodations in rules, policies, practices, or

services when such accommodations may be necessary to afford a tenant, owner, renter, or legal occupant equal opportunity to use and enjoy a housing accommodation.

6.  Print, publish, circulate or cause to be made any statement or advertisement relating to the sale, lease or acquisition of any housing accommodation or commercial property or the loan of money, whether or not secured by mortgage, or otherwise for the acquisition, construction, rehabilitation, repair or maintenance of any housing accommodation or commercial property, which indicates any preference, limitation, specification, or discrimination based upon protected class.

7.  Require as a condition of the sale or lease of any housing accommodation or commercial property or loan of any money for the purpose of housing, the disclosure of information related to an applicant's protected class.

8.  Deny any person access to or membership or participation in any multiple-listing service, real estate brokers' organization or other service, organization, or facility relating to the business of selling or renting dwellings or commercial property, or to discriminate against that person in the terms or condition of such access, membership, or participation, because of protected class.

9.  For any person or organization whose business includes engaging in real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of protected class.

10. Induce, solicit, or attempt to induce or solicit for commercial profit, any listing, sale, or transaction involving any housing accommodation or commercial property by representing that such housing accommodation or commercial property is within any neighborhood, community or area adjacent to any other area in which there reside, or do not reside, persons of any particular protected class.

11. Discourage, or attempt to discourage, the purchase or lease of any housing accommodation or commercial property by representing that such housing accommodation or commercial property is within any neighborhood, community or area adjacent to any other area in which there reside, or may in the future reside, in increased or decreased numbers, persons of any protected class.

12. For any person to harass, threaten, intimidate, harm, damage or otherwise

penalize any person, group, or business because they exercised or encouraged others to exercise their rights under this section, or because they have complied with the provisions of this section, or enjoyed the benefits of this section, or because they have made a charge, testified, or assisted in any manner in any investigation, proceeding or hearing hereunder.

13. For any person to aid, abet, incite, induce, compel or coerce the doing of an unlawful practice prohibited by this section or to obstruct or prevent any person from complying with the provisions of this section or any order issued hereunder.

14. For any person who, with intent to mislead in any proceeding under this section to destroy or mutilate, falsify, alter or refuse to supply records and documents produced pursuant to subpoena or other lawful order under this section.

15. Nothing in this section shall be construed to apply with respect to housing for older persons to the extent such language refers to age or familial status.

16. Nothing in this section limits the applicability of any reasonable local, state or federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling.

17. Nothing in this section shall prohibit a mission-driven private club not in fact open to the public, which as an incident to its primary mission provides lodgings which it owns or operates for other than a commercial purpose, from limiting the rental or occupancy of such lodgings to its bona fide members or from giving preference to its members.

18. Nothing in this section shall require a landlord to participate in any government housing programs, such as Section 8 housing.

19. The rental or leasing of a room or rooms in a personal residence in which the owner currently resides, when the renter or lessee will be sharing some or all of the space with the owner, shall be exempt from this Ordinance.

F. **Unlawful Public Accommodations Practices.** A person or an organization may not:

1. Refuse, withhold from or deny to any person because of protected class, either directly or indirectly, any of the accommodations, advantages, facilities, services or privileges of such place of public accommodation, resort or

amusement.

2. Publish, circulate, issue, display, post or mail, either directly or indirectly, any written or printed communication notice or advertisement to the effect that any of the accommodations, advantages, facilities and privileges of any such place shall be refused, withheld or denied to any person on account of protected class.

3. Prohibit a breastfeeding mother from, or segregate a breastfeeding mother within, any public accommodation where she would otherwise be authorized to be.

4. When providing licensed common carrier service, discriminate against individuals with disabilities by actions including, but not limited to, refusing to provide service to individuals with disabilities who can use such vehicles, refusing to accommodate such individuals in the use of a service animal due to blindness or deafness, or refusing to assist with the stowing of mobility devices, or charging higher fares or fees for carrying individuals with disabilities and their service animals and/or equipment which are not charged to other persons.

5. Exclude or otherwise deny services because of the disability of an individual with whom a patron, client, or customer is known to have a relationship or association.

6. Nothing in this Section shall be applied or interpreted to require an individual to create speech or artistic expression which is contrary to their sincerely held religious beliefs.

## G. Unlawful Education Practices.

1. An educational institution may not refuse, based on a protected class, access to enrollment, equal treatment, participation in programs, or to otherwise discriminate against students, families, faculty, staff, administrators, or others legitimately involved with the function of the educational institution and including faculty, staff, and administrators with respect to compensation, hiring, volunteering, tenure, conditions or privileges of employment or contract based on protected classes.

2. An educational institution may not exclude or otherwise deny access to enrollment, equal treatment or participation in programs because of the disability of an individual with whom a student is known to have a relationship or association.

3. Notwithstanding the foregoing, nothing contained herein shall require an educational institution to hire an educator that lacks a bona fide educational credential that is either required by law or customarily required by similarly situated educational institutions for similarly situated educators and employees.

H. **Unlawful Healthcare Practices.** It is unlawful for a healthcare provider to refuse or limit, based on a protected class, access to treatment, surgery, medication, healthcare insurance benefits, participation in health programs, or access to other healthcare services.

I. **Retaliation.** Filing a complaint under this Ordinance is a protected activity. It is unlawful for any person to retaliate against an individual who files a complaint under this Ordinance, regardless of the merits of the complaint. Unlawful retaliation occurs when a person takes an adverse action against an individual either in response to the exercise of rights under this Ordinance or to deter or prevent such protected activity in the future. To establish retaliation the protected individual shall demonstrate:

1. The individual or someone on behalf of the individual has been, is, or is believed to be engaged in a protected activity under this Ordinance;

2. The individual experienced an adverse action caused by the person retaliating; and

3. There is a causal connection between the protected activity and the adverse action.

J. **Procedure.** Proceedings before the Commission shall be initiated by Complaint.

1. Any person(s) who are aggrieved by an unlawful practice within the scope of this Ordinance may make, sign, and file a complaint, verified in accordance with PA Rule of Civil Procedure 1024, alleging violations of this Ordinance. The Commission, upon its own initiative, may in like manner sign, verify and file a complaint. The complaint shall include the following information:

   a. The name and address of the aggrieved person(s) (Complainant(s));

   b. The name and address of the person(s) alleged to have committed the prohibited practice (Respondent(s));

   c. A concise statement of the facts, including pertinent dates, constituting

the alleged discriminatory practice;

   d. If applicable, the address and a description of the place of employment, or dwelling unit, or public accommodation which is involved; and

   e. Such other information as may be required by the Commission.

2. The Commission or the Complainant shall have the power reasonably and fairly to amend any complaint, or withdraw it, and the Respondent shall have like power to amend their answer.

3. The Commission shall:

   a. Promulgate a form of verified Complaint which shall be made available to the public on the County's website. Failure to use the Commission's form of verified Complaint, however, shall not act as waiver where a Complainant makes an alternative written submission in which the substance of the Complainant's claims are clear;

   b. Set forth instructions for how and where Complaints shall be filed and conspicuously post its filing procedure so as to be easily available and understandable to the public.

4. All complaints must be filed within one hundred eighty (180) days of the most recent alleged act(s) of discrimination.

5. The Commission shall cause all Complaints received by it to be reviewed and, if appropriate, investigated, conciliated, and heard as set forth below.

6. Prior to undertaking an investigation, the Commission, or such persons as it may designate, shall review the Complaint to determine whether it alleges facts which, taken as true, set forth claims for which relief may be granted under this Ordinance. In undertaking such review, the Commission shall apply the standards set forth in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007) and *Ashcroft v. Iqbal,* 556 U.S. 662 (2009). Complaints which fail to meet this standard shall be deemed outside the jurisdiction of the Commission, and the Commission shall (i) provide written notice to the Complainant of its decision; and (ii) take no further action with respect to the Complaint. If the Complaint is found to be within the jurisdiction of the Commission, the Commission will send notice of such determination, along with a copy of the Complaint, to both the Complainant and Respondent.

7. The Respondent(s) may file a written, signed and verified Answer to the complaint within sixty (60) days of service of the Complaint. The Answer to a Complaint shall be filed in the such manner as the Commission shall direct, and the Commission shall make copies available to the Complainant.

8. The Commission, or such persons as it may designate, shall review the Complaint and the Answer and gather such additional information as deemed necessary to conciliate or otherwise resolve the dispute. The Commission may, in the conduct of such investigation, issue subpoenas to any person charged with an unlawful practice, to furnish information, records or other documents, or to give sworn testimony, as necessary to assist in its investigation. The Commission may seek enforcement of its subpoena by Petition to the Court of Common Pleas of Delaware County if needed.

9. Following investigation, the Commission shall provide notice of its determination to all parties. In the event the Commission concludes there is probable cause to believe a violation of this Ordinance occurred, it shall make conciliation services reasonably available to the Parties. In the event conciliation fails or is rejected by the Parties, the Commission shall schedule the matter for adjudication.

10. Matters that state claims for which relief may be granted under this Ordinance, which are supported by probable cause, and which are unresolved by conciliation shall be scheduled for public hearing.

   a. If, upon consideration of all the evidence presented at the hearing, the Commission finds that the Respondent has engaged in or is engaging in any unlawful discriminatory practice as defined in this Ordinance, the Commission shall state its findings of fact in writing and shall issue and cause to be served on the Parties an Order requiring the Respondent to cease and desist from such unlawful discriminatory practice and to take such additional action as the Commission deems appropriate. The Commission shall have the authority to order any remedies available under the Pennsylvania Human Relations Act, or the Commission may act directly to ensure there is a remedy to the discrimination by requiring the respondent to change practices, make restitution, and, in egregious instances, pay a fine of no more than $500.00.

   b. If, upon consideration of all the evidence presented at the hearing, the Commission finds that the Respondent has not engaged in any unlawful discriminatory practice, the Commission shall state its findings of fact and shall issue and cause to be served on the parties an Order dismissing the Complaint as to the Respondent.

11. Any person who shall willfully resist, prevent, impede or interfere with the Commission, its members, agents or agencies in the performance of duties pursuant to this Ordinance, or shall willfully violate an order of the Commission, shall be guilty of a summary offense and, upon conviction thereof, shall be sentenced to pay a fine of not less than one hundred dollars ($100.00) nor more than five hundred dollars ($500.00), in the discretion of the Court, but procedure for the review of an order shall not be deemed to be such willful conduct.

12. Except as otherwise provided, any order of the Commission may be reviewed under the provisions of 2 Pa.C.S. § 751, *et seq.*

**K. Private Right of Action.** Any person(s) aggrieved by a violation of this Ordinance shall have a right of action in any Court of competent jurisdiction and may recover for each violation any remedies provided under the Pennsylvania Human Relations Act or Federal law, including reasonable attorney's fees. No such private right of action, however, may be brought: (i) arising out of a Complaint filed more than one hundred eighty (180) days after the last discriminatory act alleged therein; (ii) prior to a final determination by the Commission dismissing the Complaint or finding violations of this Ordinance; (iv) following a successful conciliation between the Parties resolving the Complaint; or (v) more than one (1) year after a final determination by the Commission dismissing the Complaint or finding violations of this Ordinance. Nothing in this Ordinance shall limit the right of an aggrieved person to recover under any other applicable law or legal theory.

**L. Exemptions.** The following organizations shall be deemed exempt from the provisions of this Ordinance:

1. A not-for-profit mission-driven religious, educational, fraternal, or charitable organization or association that (i) requires an employee's adherence to said organization's or association's mission as part of their job, or wherein membership is a bona fide occupational qualification; or (ii) offers rooms or housing to members of the organization, or within the organization's mission; and

2. Nothing contained in this Ordinance shall be interpreted to require an individual or Religious entity to engage in conduct which constitutes a substantial burden on the free exercise of religion without compelling justification under the act of December 9, 2002 (P.L.1701, No.214), known as the "Religious Freedom Protection Act."

**M. Conflict of Laws.** Where a provision of this Ordinance is found to be in conflict

with a provision of any other ordinance of the County, or any regulation issued under the authority of such Ordinance, the provisions which establish the higher standard for the protection of health, safety and welfare shall prevail. The Commission shall make the determination on all ordinance conflicts related to this Ordinance.

N. **Human Relations Commission.**  A Human Relations Commission is established as set forth herein.

1.  The Commission shall be composed of volunteers and shall consist of no fewer than seven (7) and no more than thirteen (13) members. The members shall serve terms of three (3) years each, with the initial terms for one third of the members being one (1) year, one third being two (2) years and the remainder being three (3) years. At all times there shall be an odd number of members. Members shall be appointed by the County Executive and confirmed by the County Council. Members of the Commission shall be residents of the County, individuals working in the County, or business owners who operate within the County. Members of the Commission may not be elected officers in any political party.

2.  Members of the Commission shall serve without salary but may be paid expenses incurred in the performance of their duties, as approved by the Commission.

3.  The Commission is hereby vested with the authority to administer and enforce this Ordinance.

4.  Any Commission member missing three (3) meetings in a row or missing more than three (3) meetings in a twelve (12) month period will be deemed as having resigned their position as Human Relations Commissioner, and the remainder of their term will be filled by appointment in accordance with this section.

5.  If the number of Human Relations Commissioners serving on the Commission drops below seven (7) because of resignation or lack of attendance, additional Human Relations Commission members shall be appointed by the County Executive and confirmed by the County Council.  If the necessary number of Commissioners are not appointed and confirmed within sixty (60) days of the Commission dropping below seven (7) members, the Board of Commissioners shall appoint sufficient Commissioners, pro tem, to ensure the Human Relations Commission has seven (7) members.

6.  The Commission may select up to three (3) additional non-voting, ex officio members to broaden the diversity that serves and advises the Commission.

Such ex-officio members will not be counted toward the seven (7) member Commission minimum, will not count toward establishing a quorum and shall serve for no more than three (3) years.

7. The Commission shall select one (1) of its members as the Chair of the Commission, one (1) as Vice Chair, and one (1) as Secretary.

8. The Chair of the Commission shall be responsible for setting Commission meetings, coordinating with the Office of Human Resources regarding received complaints and answers, and generally ensuring that the duties of the Commission are fulfilled. The Chair may delegate responsibility for Commission duties to specific Commissioners. The Vice Chair will serve as Chair when the Chair is otherwise unavailable in emergency situations. The Commission Secretary shall coordinate minute-taking at meetings which may be done by paid staff or a Commissioner. Meetings may be recorded to assist with the preparation of the minutes.

9. A voting quorum of the Commission will be no less than half of the currently serving Commission members and may be no less than four (4) Commissioners.

10. Meetings of the Commission shall be duly advertised and conducted in accordance with the Pennsylvania Open Meetings Law.

11. The Commission shall:

   a. Meet monthly in-person or virtually on-line.

   b. Promote mutual understanding and work to improve relationships among all parts of the County community, inclusive but not limited to those representing the protected classes covered by the Human Relations Ordinance.

   c. Make studies into the status of human relations in the County.

   d. At its discretion, cooperate with and assist other organizations, public or private, to improve relationships among the citizens of the County.

   e. Provide educational information to community members and to organizations to promote a full understanding of the purpose and scope of the Human Relations Ordinance.

f.  Receive and consider complaints of discrimination and administer and enforce the Human Relations Ordinance.

g.  When appropriate, the Commission may, in its discretion, refer complainants to other social, civic, or government agencies for further action.

h.  From time to time, but not less than once a year, provide a written report to the Board of Commissioners, describing in detail the investigations, proceedings, hearings and studies it has conducted and their outcome, the decisions it has rendered and the other work performed by it and make recommendations for such further legislation concerning abuses and discrimination because of protected class.

i.  Maintain official copies of the minutes of Commission meetings, records of investigations and proceedings, recordings of hearings, studies conducted and their outcomes, the decisions rendered by the Commission and records of any other work performed by the Commission.

j.  Promulgate and, from time-to-time amend, rules consistent with this Ordinance respecting the filing of Complaints and Answers, the process for Jurisdictional Review and investigations, the conduct of mediations and hearings, and the delegation of its duties.

k.  The Commission may hire staff and make other expenditures to the extent such expenses are budgeted by County Council and approved by the County Executive and Controller.  The Commission may make use of County personnel to the extent approved by the County Executive and the respective Department Head.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

Civil Action No. _____

---

Gregory Stenstrom, Pro Se
Plaintiff,

v.

Delaware County (*for identification of the rulemaking body*);
Delaware County Council (*for identification of the rulemaking body*);
Dr. Monica Taylor, in her official capacity;
Richard R. Womack, in his official capacity;
Kevin M. Madden, in his official capacity;
Elaine Paul Schaefer, in her official capacity;
Christine A. Reuther, in her official capacity;
Jack Larkin, in his official capacity;
and all persons acting under color of Ordinance 2025-06,
Defendants.

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S COMPLAINT**
**FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**
**(42 U.S.C. § 1983; U.S. Const. Amends. I & XIV)**

---

**TABLE OF CONTENTS**

| Section | Page |
|---|---|
| I. Introduction | 4 |
| II. Statement of Facts | 5 |
| III. Standing | 6 |
| IV. Justiciability | 7 |
| V. Questions Presented | 8 |
| VI. Argument | 9 |
| A. Ultra Vires and Separation of Powers | 9 |
| B. Due Process Violations | 11 |

| Section | Page |
|---|---|
| C. Denial of Access to Courts | 12 |
| D. First Amendment Risks | 13 |
| E. Retaliation Under §§ 1983, 1985, 1986 | 14 |
| F. Vagueness and Overbreadth (with Exhibit B) | 15 |
| G. Equal Protection | 16 |
| H. Stated Purpose vs. Real Function (including procedural abuse and disproportionality) | 16 |
| I. Anticipated Defenses: Rooker-Feldman, Pullman, Younger | 18 |
| J. Summary of Anticipated Defenses | 19 |
| VII. Conclusion | 21 |
| VIII. Requested Relief (Relief Ladder) | 22 |

## TABLE OF AUTHORITIES

| Authority | Page(s) |
|---|---|
| **U.S. Supreme Court Cases** | |
| Alaska Airlines, Inc. v. Brock, 480 U.S. 678 (1987) | 18, 20 |
| Arizona v. United States, 567 U.S. 387 (2012) | 4, 10 |
| Baker v. Carr, 369 U.S. 186 (1962) | 7, 18 |
| Bounds v. Smith, 430 U.S. 817 (1977) | 12, 13 |
| Christopher v. Harbury, 536 U.S. 403 (2002) | 12, 13 |
| City of Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750 (1988) | 8, 13, 18 |
| Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280 (2005) | 8, 18 |
| Grayned v. City of Rockford, 408 U.S. 104 (1972) | 15, 18 |
| Kolender v. Lawson, 461 U.S. 352 (1983) | 15, 18 |
| Logan v. Zimmerman Brush Co., 455 U.S. 422 (1982) | 8, 12, 18 |
| Loper Bright Enters. v. Raimondo, 603 U.S. ___ (2024) | 4, 9 |
| Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) | 4, 6, 12, 18 |
| Mathews v. Eldridge, 424 U.S. 319 (1976) | 11, 18 |
| Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n, 138 S. Ct. 1719 (2018) | 13, 18 |
| MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118 (2007) | 8, 12, 18 |

| Authority | Page(s) |
|---|---|
| Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977) | 14, 18 |
| Papachristou v. City of Jacksonville, 405 U.S. 156 (1972) | 15 |
| Perry v. Sindermann, 408 U.S. 593 (1972) | 14, 18 |
| Railroad Comm'n of Texas v. Pullman Co., 312 U.S. 496 (1941) | 8, 18 |
| SEC v. Chenery Corp., 318 U.S. 80 (1943) | 22 |
| Tumey v. Ohio, 273 U.S. 510 (1927) | 4, 11, 18 |
| Village of Willowbrook v. Olech, 528 U.S. 562 (2000) | 16 |
| Ward v. Monroeville, 409 U.S. 57 (1972) | 4, 11, 18 |
| Yick Wo v. Hopkins, 118 U.S. 356 (1886) | 16, 18 |
| Zivotofsky v. Clinton, 566 U.S. 189 (2012) | 7, 18 |

**Pennsylvania Supreme Court & Commonwealth Court Cases**

| | |
|---|---|
| Holt's Cigar Co. v. City of Philadelphia, 10 A.3d 902 (Pa. Commw. Ct. 2011) | 4, 9, 18 |
| Pa. Restaurant & Lodging Ass'n v. Pittsburgh, 211 A.3d 810 (Pa. 2019) | 5, 10, 18 |

**Statutes and Federal Law**

| | |
|---|---|
| 42 U.S.C. § 1983 | 14, 18 |
| 42 U.S.C. § 1985 | 14, 18 |
| 42 U.S.C. § 1986 | 14, 18 |
| 42 U.S.C. § 1988 | 22 |
| Fed. R. Civ. P. 52(a) | 22 |
| 43 P.S. § 962.1 (Pennsylvania Human Relations Act) | 4, 5, 10 |
| Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. | 5, 15 |
| Fair Housing Act, 42 U.S.C. § 3601 et seq. | 5, 15 |
| Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. | 5, 15 |
| Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. | 5, 15 |
| Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq. | 15 |
| Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. | 15 |

**Constitutional Provisions**

| | |
|---|---|
| U.S. Const. amend. I | 12, 13 |

| Authority | Page(s) |
|---|---|
| U.S. Const. amend. XIV | 11, 14, 15 |
| Pa. Const. art. V, § 1 | 4, 9, 18 |

## I. INTRODUCTION

Plaintiff Gregory Stenstrom submits this Memorandum of Law in support of his Complaint challenging Delaware County Ordinance 2025-06. The Ordinance establishes a Human Relations Commission ("HRC") with **subpoena power, compulsory testimony, adjudicatory authority, fines, and mandatory exhaustion before courts.** These powers exceed any authority granted under the Pennsylvania Human Relations Act ("PHRA") and violate fundamental constitutional guarantees.[1]

The Ordinance operates as a modern **"star chamber."**[2] It conditions judicial access on submission to a partisan tribunal of unelected volunteers appointed by the same political officials whose actions they are expected to oversee. This structure denies **due process, infringes free expression, obstructs access to courts, and violates separation of powers**.[3]

Far from filling a gap in civil-rights enforcement, Ordinance 2025-06 duplicates remedies already provided under state and federal law. The PHRC and federal agencies such as the EEOC, HUD, and DOJ already supply comprehensive remedies in employment, housing, education, and public accommodations. The Ordinance adds nothing but **procedural delay and partisan control**.[4]

---

[1] See *Loper Bright Enterprises v. Raimondo*, 603 U.S. ___ (2024) (courts must independently review assertions of jurisdiction by administrative bodies); *Arizona v. United States*, 567 U.S. 387, 401–02 (2012) (field preemption applies where federal law occupies the entire field of regulation).

[2] A star chamber refers to a notorious former English court, formally known as the Court of Star Chamber, which operated from the late 15th century until its abolition in 1641. In modern usage, the term "star chamber" is used metaphorically to describe any secretive, unfair, or arbitrary judicial or administrative proceeding that lacks due process.

[3] *Pa. Const. art. V, § 1* (vesting judicial power exclusively in courts); *Tumey v. Ohio*, 273 U.S. 510 (1927); *Ward v. Monroeville*, 409 U.S. 57 (1972) (biased or structurally compromised tribunals violate due process).

[4] 43 P.S. § 962.1 (authorizing municipal commissions with powers "similar" to PHRC); *Pennsylvania Restaurant & Lodging Ass'n v. City of Pittsburgh*, 211 A.3d 810, 823 (Pa. 2019) (local ordinances preempted where state law provides comprehensive remedies); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; Fair Housing Act, 42 U.S.C. § 3601 et seq.; Americans with

Finally, the record shows that this Ordinance was not enacted neutrally. It arose in the context of sustained **retaliatory lawfare** against Plaintiff — including defamation suits, sanctions motions, malicious prosecution, and coordinated media attacks — all designed to obstruct his oversight of election misconduct. Ordinance 2025-06 is the latest escalation in that campaign.

---

## II. STATEMENT OF FACTS

On **August 20, 2025**, Delaware County Council enacted **Ordinance 2025-06** creating a County Human Relations Commission ("HRC").[5]

The Ordinance grants the HRC **broad quasi-judicial powers**: it may issue subpoenas, compel sworn testimony, hold hearings, impose fines of up to $500, and dismiss complaints.[6]

The Ordinance also establishes a **mandatory exhaustion requirement**. Residents must first submit claims to the HRC before they may seek judicial relief.[7]

The Pennsylvania Human Relations Act ("PHRA") permits local commissions with "powers and duties similar to" the Pennsylvania Human Relations Commission. Yet the PHRC itself does **not** impose compulsory exhaustion or exercise independent judicial power. Delaware County has therefore exceeded its statutory authority.[8]

The circumstances of enactment further confirm improper purpose. Plaintiff has been the subject of **sustained retaliatory lawfare**, including multiple defamation suits, malicious prosecution, sanctions motions, and denial of Right-to-Know requests. Ordinance 2025-06 was designed and enacted in this context to obstruct Plaintiff's oversight litigation and suppress his constitutionally protected activity.[9]

---

Disabilities Act, 42 U.S.C. § 12101 et seq.; Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq.

[5] Delaware County Ordinance 2025-06, enacted Aug. 20, 2025. See Ordinance text §§ 6-89(A)–(B)

[6] Id. §§ 6-89(J)(8)–(10), (J)(11) (subpoena power, hearings, fines, enforcement).

[7] Id. § 6-89(J)(4), (J)(10), (K) (mandatory complaint procedure, exhaustion prior to judicial action).

[8] PHRA, 43 P.S. § 962.1; cf. *Pa. Restaurant & Lodging Ass'n v. Pittsburgh*, 211 A.3d 810, 823 (Pa. 2019) (local ordinances preempted where state law already provides comprehensive remedies).

[9] See Exhibit A (Coordinated Retaliation and Lawfare Against Plaintiff), documenting defamation suits, malicious prosecution, sanctions campaigns, and suppression of RTK requests; see also

## III. STANDING

Article III requires that a plaintiff establish standing by showing **(1) injury in fact, (2) causation, and (3) redressability**.[10] These elements are satisfied here.

**Injury in Fact.** Plaintiff is not a generalized taxpayer or concerned citizen. He is a qualified voter and active pro se litigant who has repeatedly filed Right-to-Know Law, Sunshine Act, and election-related cases. Ordinance 2025-06 directly burdens him by forcing his claims into a partisan tribunal of unelected appointees before he can reach the courts. That is a **concrete, particularized, and imminent harm**.

**Causation.** The injury is traceable to Defendants' enactment of **Ordinance 2025-06**. The mandatory exhaustion requirement ensures that Plaintiff's claims will be delayed, chilled, or dismissed by political actors loyal to County Council (Defendants). This is not speculative: Plaintiff has already been subjected to a five (5) year **coordinated campaign of retaliatory defamation suits, malicious prosecution, sanctions, and media attacks** designed to obstruct his litigation.[11] The Ordinance is the next escalation of that campaign.

**Redressability.** This Court has authority to declare the Ordinance unconstitutional and enjoin its enforcement. Such relief will eliminate the unlawful barrier to court access and ensure Plaintiff may continue to vindicate his rights before neutral tribunals.

Justice Scalia in *Lujan v. Defenders of Wildlife* warned against courts fostering **"learned helplessness"** by denying standing where citizens face direct, particularized harms.[12] The deliberate design of Ordinance 2025-06 — to funnel critics into a partisan star chamber — is a textbook example. To deny standing here

---

*Huffman v. Pursue, Ltd.*, 420 U.S. 592 (1975) (bad-faith enforcement removes Younger abstention shield).

[10] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (Scalia, J.) (defining the "irreducible constitutional minimum" of standing: injury in fact, causation, and redressability).

[11] See Exhibit A (Coordinated Retaliation and Lawfare Against Plaintiff), documenting defamation suits, malicious prosecution, sanctions campaigns, and coordinated media attacks.

[12] *Lujan*, 504 U.S. at 578 (Scalia, J., concurring) (warning against judicial decisions that create "learned helplessness" by denying standing despite clear harm). See also Judicial Notice of Learned Helplessness and Government Retaliation under *Lujan v. Defenders of Wildlife* (filed Aug. 29, 2025)

would teach that government abuse cannot be challenged, exactly the "helplessness" that *Lujan* cautions against.

Defendants may argue, as other courts have in unrelated election cases, that Plaintiff's claimed injury is "speculative." That objection misunderstands the nature of this case. The injury here is not dependent on hypothetical misuse of the Ordinance but arises **immediately and structurally** from its text: residents are required to exhaust remedies before a partisan Commission prior to reaching the courts. The Supreme Court has held that the denial of direct judicial access is itself a cognizable constitutional injury.[13] As Justice Scalia warned in *Lujan v. Defenders of Wildlife*, denying standing where citizens face such direct barriers fosters **"learned helplessness,"** teaching that government abuse cannot be challenged.[14] Here, the injury is not speculative; it is **embedded in the Ordinance's design**.

Accordingly, Plaintiff easily satisfies Article III standing.

---

## IV. JUSTICIABILITY

Federal courts have an independent obligation to confirm that a case is justiciable. Defendants may argue that Plaintiff's challenge is premature, speculative, or presents a "political question" reserved to municipal discretion. None of these objections apply here.

**First, facial constitutional challenges are immediately justiciable.** The Supreme Court has long recognized that laws which create structural barriers to constitutional rights can be challenged the moment they are enacted. In *City of Lakewood v. Plain Dealer Publ'g Co.*, the Court held that ordinances granting standardless discretion are subject to facial attack without waiting for enforcement.[15]

---

[13] *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428–33 (1982) (holding that extinguishing claims through procedural barriers violates due process and access to courts); *Christopher v. Harbury*, 536 U.S. 403, 414–15 (2002) (recognizing denial of a forum as a constitutional injury).

[14] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 578 (1992) (Scalia, J., concurring) (warning against judicial rulings that create "learned helplessness" by denying standing despite clear harm); see also Judicial Notice of Learned Helplessness and Government Retaliation under *Lujan* (filed Aug. 29, 2025)

[15] *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755–56 (1988) (facial challenges permitted where ordinances confer unbridled discretion that chills constitutional rights).

**Second, coercive legal structures themselves create standing and ripeness.** In *MedImmune v. Genentech*, the Court rejected the argument that a plaintiff must first violate a law and risk penalties before challenging it. The Court explained that the existence of a coercive structure is itself sufficient to confer jurisdiction.[16] Ordinance 2025-06 forces all residents, including Plaintiff, into a partisan tribunal before judicial access is allowed. That coercive scheme is a present and ongoing constitutional injury.

**Third, this case does not raise a non-justiciable "political question."** The Ordinance is not a matter of local policy within Council's discretion — it is a structural obstruction of federal rights. Determining whether a law violates the First and Fourteenth Amendments is the quintessential role of Article III courts, not a political question. Determining constitutionality is **never** a political question; it is the core function of Article III courts [17]

Accordingly, Plaintiff's claims are justiciable on their face. This Court has jurisdiction and a duty to reach the merits.

---

## V. QUESTIONS PRESENTED

1. Whether Delaware County may, consistent with the Pennsylvania Human Relations Act and the Pennsylvania Constitution, establish a local commission with **subpoena power, compulsory testimony, fines, and mandatory exhaustion before courts**.[18]

2. Whether forcing Plaintiff before a **partisan tribunal of unelected political appointees** violates the **Due Process Clause** of the Fourteenth Amendment.[19]

---

[16] *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007) (plaintiff need not violate law or risk penalties before challenging constitutionality; coercive structures suffice for standing and ripeness).

[17] *Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012) ("The political question doctrine does not bar review of claims that a statute violates the Constitution.").

[18] PHRA, 43 P.S. § 962.1; *Pa. Const. art. V, § 1*; *Loper Bright Enters. v. Raimondo*, 603 U.S. ___ (2024) (courts must review administrative assertions of power independently).

[19] *Mathews v. Eldridge*, 424 U.S. 319 (1976); *Tumey v. Ohio*, 273 U.S. 510 (1927); *Ward v. Monroeville*, 409 U.S. 57 (1972).

3. Whether conditioning judicial access on **exhaustion before the HRC** violates the **constitutional right of access to courts**.[20]

4. Whether Ordinance 2025-06 creates unconstitutional risks of **compelled speech and viewpoint discrimination**, contrary to the **First Amendment**.[21]

5. Whether Ordinance 2025-06 is **unconstitutionally vague and overbroad**, enabling arbitrary enforcement and chilling protected expression.[22]

6. Whether abstention doctrines such as **Rooker-Feldman, Pullman, or Younger** prevent this Court from exercising jurisdiction, where the Ordinance is facially unconstitutional and enacted in bad faith.[23]

---

## VI. ARGUMENT

### A. ULTRA VIRES AND SEPARATION OF POWERS

The Pennsylvania Constitution vests **judicial power <u>exclusively</u> in the courts**.[24] Ordinance 2025-06 attempts to delegate that power to unelected volunteers appointed by County Council and the County Executive. By authorizing these political appointees to issue subpoenas, compel testimony, conduct hearings, and impose fines, the Ordinance improperly vests judicial authority in a partisan body outside the judiciary.

---

[20] *Christopher v. Harbury*, 536 U.S. 403 (2002); *Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982).

[21] *303 Creative LLC v. Elenis*, 600 U.S. ___ (2023); *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719 (2018).

[22] *Grayned v. City of Rockford*, 408 U.S. 104 (1972) (striking vague ordinance that allowed arbitrary enforcement).

[23] *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280 (2005) (Rooker-Feldman narrow scope); *Railroad Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941) (Pullman abstention limited to unsettled state law); *Huffman v. Pursue, Ltd.*, 420 U.S. 592 (1975) (bad faith defeats Younger abstention).

[24] *Pa. Const. art. V, § 1* ("The judicial power of the Commonwealth shall be vested in a unified judicial system consisting of the Supreme Court, the Superior Court, the Commonwealth Court, courts of common pleas, community courts, municipal and traffic courts….").

Such delegation is **ultra vires**. County Council has no authority to create a parallel tribunal with powers that the Pennsylvania Human Relations Commission itself does not possess. The PHRA permits local commissions with "powers and duties similar to" the PHRC, but "similar" cannot mean greater.[25]

Federal and state precedent confirm the limits of delegation. Courts must independently review administrative assertions of jurisdiction; they may not defer when local governments attempt to redefine judicial power. In *Loper Bright Enterprises v. Raimondo*, the Supreme Court emphasized that courts cannot abdicate review of administrative authority.[26] Likewise, Pennsylvania courts have held that local ordinances are preempted when they intrude into fields already comprehensively occupied by state law, such as employment and discrimination regulation.[27]

The Commonwealth Court's decision in *Holt's Cigar Co. v. Philadelphia* illustrates this limit, striking a local wage ordinance because state law had already occupied the field.[28]

In short, Ordinance 2025-06 usurps judicial power and exceeds the authority granted by the PHRA. It must be declared unconstitutional.

These allegations correspond to **Count II of the Complaint**.

---

[25] PHRA, 43 P.S. § 962.1 (authorizing local commissions with powers "similar to" the PHRC); cf. *Pa. Restaurant & Lodging Ass'n v. City of Pittsburgh*, 211 A.3d 810, 823 (Pa. 2019) (holding local ordinances preempted where state law provides comprehensive remedies).

[26] *Loper Bright Enters. v. Raimondo*, 603 U.S. ___ (2024) (rejecting deference that would allow agencies to self-define jurisdiction).

[27] *Arizona v. United States*, 567 U.S. 387, 401–02 (2012) (field preemption applies where federal law occupies the field); *Holt's Cigar Co. v. City of Philadelphia*, 10 A.3d 902, 905 (Pa. Commw. Ct. 2011) (invalidating local ordinances inconsistent with state law).

[28] *Holt's Cigar Co. v. City of Philadelphia*, 10 A.3d 902, 905 (Pa. Commw. Ct. 2011) (invalidating local ordinance where state law occupied the field).

## B. DUE PROCESS VIOLATIONS

The Fourteenth Amendment guarantees that citizens may not be deprived of liberty or property without **due process of law**.[29] Ordinance 2025-06 disregards this guarantee.

First, it **forces residents into hearings before partisan appointees** who are neither judges nor bound by judicial canons. These "volunteers" are chosen by County Council and the County Executive, the very political actors whose conduct they may be called to review. This creates an inherent conflict of interest and strips proceedings of impartiality.

Second, the Ordinance provides **no meaningful safeguards**. The Commission may issue subpoenas, compel sworn testimony, conduct investigations, and impose fines of up to $500.[30] Yet it has no requirement to apply rules of evidence, no guarantee of neutral adjudicators, and no avenue for meaningful judicial oversight before sanctions are imposed.

The Supreme Court has long held that **biased or structurally compromised tribunals violate due process.** In *Tumey v. Ohio*, the Court invalidated a system where decisionmakers had a financial interest in outcomes. In *Ward v. Monroeville*, it struck down proceedings where adjudicators were tied to executive interests. The Court's balancing test in *Mathews v. Eldridge* makes clear that when the risk of erroneous deprivation is high and procedural safeguards are absent, due process is denied.[31]

By compelling residents to submit to partisan adjudication under Ordinance 2025-06, Delaware County creates an unconstitutional structure. The lack of neutrality, combined with sweeping enforcement powers, makes erroneous deprivations not only possible but inevitable. The Ordinance must be enjoined on this ground alone.

These allegations correspond to **Count I of the Complaint**.

---

[29] *U.S. Const. amend. XIV, § 1* ("…nor shall any State deprive any person of life, liberty, or property, without due process of law.").

[30] Delaware County Ordinance 2025-06, §§ 6-89(J)(8)–(11) (Commission may issue subpoenas, compel testimony, hold hearings, and impose fines).

[31] *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) (requiring balancing of private interest, risk of erroneous deprivation, and government interest); *Tumey v. Ohio*, 273 U.S. 510 (1927); *Ward v. Monroeville*, 409 U.S. 57 (1972).

## C. DENIAL OF ACCESS TO COURTS

The Constitution guarantees every citizen a meaningful right of access to the courts.[32] Ordinance 2025-06 directly obstructs that right.

The Ordinance imposes a **mandatory exhaustion requirement**. Residents must first file with the Human Relations Commission, undergo its investigatory and hearing processes, and wait for dismissal or findings before they may pursue relief in court. Until the Commission acts, courts are closed to them. This structure is not found in the PHRC itself, and it deprives residents of the timely, independent judicial review that the Constitution requires.

The Supreme Court has repeatedly held that statutes or procedures that block or delay judicial remedies violate access-to-courts guarantees. In *Christopher v. Harbury*, the Court confirmed that the denial of a forum to pursue claims is itself a constitutional injury. In *Logan v. Zimmerman Brush Co.*, it invalidated a state scheme that extinguished discrimination claims because of agency inaction, holding that litigants cannot be denied judicial review due to procedural roadblocks outside their control.[33]

By forcing litigants to submit to partisan adjudication before unelected appointees, Ordinance 2025-06 imposes a barrier that is **structural, not incidental.** It conditions the exercise of a constitutional right — access to the courts — on the will of a political body with no judicial legitimacy. That barrier is unconstitutional on its face.

Defendants are likely to argue that Plaintiff's injury is "speculative," as if the Ordinance might never be applied in a way that causes harm. That argument fails. The injury arises **on the face of the Ordinance itself**: by its plain text, litigants are required to exhaust remedies before a partisan Commission prior to reaching the courts. The Supreme Court has made clear that the denial or obstruction of judicial access is itself a constitutional injury, regardless of how a tribunal might

---

[32] *U.S. Const. amend. I* (right to petition government for redress of grievances); *U.S. Const. amend. XIV* (due process includes right of access to courts). See also *Bounds v. Smith*, 430 U.S. 817, 828 (1977) ("the fundamental constitutional right of access to the courts requires state actors to ensure meaningful access").

[33] *Christopher v. Harbury*, 536 U.S. 403, 414–15 (2002) (recognizing denial of judicial forum as constitutional injury); *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428–33 (1982) (holding Illinois scheme unconstitutional where agency inaction cut off discrimination claims).

later apply the law.[34] To label such harm "speculative" would ignore that the courthouse door is already locked until a partisan body provides its permission. As Justice Scalia cautioned in *Lujan v. Defenders of Wildlife*, denying standing in such circumstances fosters "learned helplessness," teaching citizens that government abuse cannot be challenged.[35] The Ordinance thus imposes a **structural and immediate violation** of Plaintiff's right of access to the courts.

These allegations correspond to **Count III of the Complaint**.

---

## D. FIRST AMENDMENT RISKS

The First Amendment prohibits government action that compels speech, suppresses belief, or discriminates based on viewpoint.[36] Ordinance 2025-06 places all three risks squarely before residents of Delaware County.

First, the Ordinance empowers commissioners to **adjudicate claims directly involving expression and association.** For example, discrimination allegations may arise from speech, religious practices, hiring decisions, or expressive services. By giving partisan appointees authority to compel testimony and issue binding orders, the Ordinance creates an unconstitutional risk of **compelled speech**.

Second, the Ordinance authorizes commissioners to **evaluate, punish, or reward conduct based on viewpoint.** Commissioners may decide whether statements, publications, or even silence constitute "discrimination." Because commissioners are political volunteers, not judges bound by First Amendment jurisprudence, this discretion invites arbitrary enforcement against disfavored speakers.

The Supreme Court has repeatedly held that **the government may not force citizens to express messages they reject, nor may it penalize speech based on viewpoint.** In *303 Creative LLC v. Elenis*, the Court invalidated a state

---

[34] *Bounds v. Smith*, 430 U.S. 817, 828 (1977) (recognizing a fundamental constitutional right of access to the courts); *Christopher v. Harbury*, 536 U.S. 403, 414–15 (2002) (denial of a forum to pursue claims is itself a constitutional injury); *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428–33 (1982) (litigants cannot be denied judicial review due to procedural barriers outside their control).

[35] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 578 (1992) (Scalia, J., concurring) (warning that denying standing where citizens face direct, particularized harms produces "learned helplessness" by teaching that government abuse is unchallengeable).

[36] *U.S. Const. amend. I* ("Congress shall make no law… abridging the freedom of speech… or the right of the people peaceably to assemble…"); incorporated against the states through *U.S. Const. amend. XIV.*

requirement that an artist create expressive content contrary to her beliefs. In *Masterpiece Cakeshop v. Colorado*, the Court emphasized that adjudicatory bodies must remain neutral toward religion and viewpoint when resolving discrimination claims.[37]

By empowering unelected political actors to decide which beliefs, associations, or expressions constitute unlawful discrimination, Ordinance 2025-06 erects a system inherently at odds with the First Amendment. The risk of compelled speech and viewpoint discrimination is not hypothetical — it is built into the Ordinance's design.

As in *City of Lakewood*, where unbridled discretion chills speech at enactment, laws granting partisan officials' discretion to penalize or compel expression are constitutionally infirm **on their face**, without waiting for enforcement.[38]

These allegations correspond to **Count IV of the Complaint**.

---

## E. RETALIATION UNDER §§ 1983, 1985, 1986

Ordinance 2025-06 was enacted in the context of a sustained campaign of lawfare targeting Plaintiff's protected oversight activities. Retaliation of this kind violates the First and Fourteenth Amendments and is actionable under 42 U.S.C. §§ 1983, 1985, and 1986. See *Mt. Healthy v. Doyle*, 429 U.S. 274 (1977); *Perry v. Sindermann*, 408 U.S. 593 (1972). The factual record of retaliatory litigation, sanctions, and media coordination is set forth in **Exhibit A**, incorporated by reference.[39]

These allegations correspond to **Count V of the Complaint**.

---

[37] *303 Creative LLC v. Elenis*, 600 U.S. ___ (2023) (First Amendment protects speakers from being compelled to create messages they do not believe); *Masterpiece Cakeshop v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1729–32 (2018) (government must remain neutral toward religion and expression when adjudicating discrimination claims).

[38] *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755–56 (1988).

[39] As detailed in Exhibit A, Defendants coordinated three defamation suits, a malicious prosecution case, multiple sanctions motions totaling over $100,000 (later reversed), and coordinated media smear campaigns with national outlets. These actions demonstrate that Ordinance 2025-06 is the next escalation in an ongoing retaliatory effort to obstruct Plaintiff's oversight litigation.

## F. VAGUENESS AND OVERBREADTH

The Fourteenth Amendment prohibits laws that are so vague or overbroad that they enable arbitrary enforcement or chill protected expression.[40] Ordinance 2025-06 suffers from both defects.

First, its scope is **sweeping and undefined.** The Ordinance extends protections to categories far beyond those in state or federal law — including "height," "weight," "genetic information," "familial status," and "source of income." These terms are not defined in the Ordinance, nor in the PHRA. This vagueness leaves commissioners free to interpret them however they choose.

Second, the Ordinance grants commissioners' **broad discretionary powers** — subpoenas, compulsory testimony, hearings, fines — without judicial safeguards.[41] When vague categories are paired with unchecked power, the result is a system where political appointees can punish disfavored speakers while ignoring similar conduct from allies.

The Supreme Court has consistently held that vague laws invite arbitrary enforcement to violate due process. In *Grayned v. City of Rockford*, the Court struck down an ordinance because its unclear terms left enforcement to the whim of officials. The same danger exists here.[42]

Third, Ordinance 2025-06 is **overbroad.** By covering expressive conduct that state and federal law leave unregulated, it sweeps in protected speech and cultural expression. **Exhibit B** (Illustrative Enforcement Scenarios) demonstrates how the Ordinance could be misused: disciplining teachers for cultural dress, fining residents for casual remarks, or imposing liability for hiring or religious practices. These examples show the inevitable absurdities and constitutional harms that flow from vague, sweeping provisions.

In sum, Ordinance 2025-06 invites arbitrary enforcement, chills speech, and reaches well beyond legitimate anti-discrimination concerns. On vagueness and overbreadth grounds alone, it must be invalidated.

---

[40] *U.S. Const. amend. XIV*; see *Kolender v. Lawson*, 461 U.S. 352, 357 (1983) (laws must provide clear standards to avoid arbitrary enforcement).

[41] Delaware County Ordinance 2025-06, §§ 6-89(J)(8)–(11).

[42] *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972) (invalidating vague ordinance that invited arbitrary enforcement). See also *Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972) (striking vagrancy law as vague and overbroad).

These allegations correspond to **Count VI of the Complaint**.

## G. EQUAL PROTECTION

Ordinance 2025-06 also violates the Equal Protection Clause. On its face the Ordinance purports to be neutral, but in practice it vests **unbounded discretion in partisan appointees** of County Council to decide what constitutes "discrimination." The Supreme Court in *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), struck down a facially neutral ordinance that was applied in a discriminatory manner because it delegated standardless discretion to local officials. The same principle applies here. By leaving undefined categories such as "height," "weight," and "source of income" in the hands of partisan volunteers, the Ordinance invites **selective enforcement against disfavored speakers and litigants** while ignoring allies. Such unbounded discretion, even if exercised only occasionally, violates equal protection because it permits discrimination by design. Ordinance 2025-06 is therefore unconstitutional on this ground as well.[43]

These allegations correspond to **Count VIII of the Complaint**.

## H. STATED PURPOSE VS. REAL FUNCTION

Defendants present Ordinance 2025-06 as a civil-rights enforcement measure modeled on the Pennsylvania Human Relations Act ("PHRA"). Its preamble declares opposition to discrimination and claims to provide local remedies. Yet the Ordinance's **design, structure, and inevitable effects** show its purpose is entirely different.

**First, compulsory exhaustion.** The PHRC itself does not require residents to exhaust administrative remedies before filing suit. Ordinance 2025-06 does. It conditions access to the courts on prior submission to a partisan County tribunal, transforming what the PHRA envisions as an optional conciliator into a **mandatory gatekeeper**.[44]

---

[43] See *Village of Willowbrook v. Olech*, 528 U.S. 562, 564–65 (2000) (per curiam) (recognizing Equal Protection claim where government singled out one individual for different treatment without rational basis). This modern application of *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), confirms that even facially neutral laws that confer standardless discretion violate Equal Protection when they invite arbitrary or partisan enforcement.

[44] PHRA, 43 P.S. § 962.1; compare *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428–33 (1982) (due process violated when agency inaction blocks judicial review).

**Second, quasi-judicial powers.** The Ordinance delegates authority to unelected "volunteers" appointed by County Council and the County Executive. These political appointees are given subpoena power, compulsory testimony, hearings, fines, and restitution authority — powers the PHRC itself does not wield.[45] The Pennsylvania Constitution vests such authority exclusively in the courts, not in ad hoc partisan bodies.

**Third, vague and sweeping scope.** The Ordinance extends coverage far beyond state and federal law — listing categories like "height," "weight," "familial status," "genetic information," and "source of income" without definitions. Combined with broad investigatory powers, this vagueness makes the Ordinance a tool for **arbitrary and retaliatory enforcement**. Commissioners can punish disfavored citizens while ignoring allies under the same provisions. **Exhibit B** (Illustrative Enforcement Scenarios) demonstrates how such vague categories produce absurd and discriminatory outcomes in practice.

**Fourth, procedural abuse.** The Ordinance is silent on what types of claims are excluded. That silence invites abuse: County Solicitors could reroute Right-to-Know disputes, election challenges, or governance lawsuits into the Commission as "public accommodation" or "retaliation" claims. By forcing all grievances into this bottleneck, the Commission becomes not a civil-rights body but a **partisan filter for disfavored litigation**.[46]

**Fifth, disproportionate utility.** The Ordinance subjects the entire county population to coercive authority while serving only a very small subset of residents.[47]

Taken together, these provisions reveal that Ordinance 2025-06 is **not about protecting civil rights.** It is a political weapon, designed to obstruct litigation,

---

[45] Delaware County Ordinance 2025-06, §§ 6-89(J)(8)–(11); *Pa. Const. art. V, § 1* (judicial power vested in courts).

[46] See *Huffman v. Pursue, Ltd.*, 420 U.S. 592 (1975) (bad-faith procedures cannot shield enforcement under Younger abstention).

[47] Federal and state civil rights data confirm that only 1–2% of residents file discrimination claims in a given year, with perhaps 5–10% reporting such experiences at any time. Applied to Delaware County's population of approximately 560,000, this equates to fewer than 10,000 residents annually — while exposing the entire county to subpoenas, fines, and coerced participation. See, e.g., U.S. Equal Employment Opportunity Commission (EEOC), Charge Statistics (Charges filed with EEOC & state/local FEPAs combined, 1997–2023), available at https://www.eeoc.gov/statistics/charge-statistics.

punish critics, and empower partisan volunteers with authority they could never lawfully obtain under state or federal law.

The unconstitutional provisions are **not severable**, because the Commission's only function is as a **mandatory tribunal**; without compulsory exhaustion, subpoena, and adjudicatory powers, the Ordinance collapses into redundancy with the PHRC and serves no independent purpose.

The defects identified herein support **Counts II, V, VI, and VIII of the Complaint**.

---

## I. ANTICIPATED DEFENSES AND REBUTTALS

Defendants will raise every available defense to preserve Ordinance 2025-06. Each has been anticipated and rebutted below and in **Exhibit C (Defense/Rebuttal/Authority Chart)**.

1. **Standing / Ripeness.** Injury arises immediately from mandatory exhaustion before a partisan tribunal. See *Lujan*; *MedImmune*; supra §III; Ex. C.

2. **Political Question.** Constitutionality is never a political question; it is the core function of Article III courts. See *Baker*; *Zivotofsky*; supra §IV; Ex. C.

3. **Abstention (Rooker-Feldman / Pullman / Younger).** Rooker-Feldman does not apply (no state judgment); Pullman does not apply (PHRA settled); Younger does not apply (no proceeding; bad-faith enactment). See *Exxon Mobil*; *Pullman*; *Huffman*; supra §H.6; Ex. C.

4. **Ultra Vires / Separation of Powers.** PHRA permits "similar," not "greater" powers; judicial power vested exclusively in courts. See *Holt's Cigar*; Pa. Const. art. V, §1; *Tumey*; *Ward*; supra §§VI.A–B; Ex. C.

5. **Due Process.** Structural bias, compelled exhaustion, and lack of safeguards violate Fourteenth Amendment guarantees. See *Mathews*; supra §VI.B; Ex. C.

6. **Access to Courts.** Denial of direct judicial access is a constitutional injury. See *Logan*; *Harbury*; supra §VI.C; Ex. C.

7. **First Amendment Carve-Out.** Religious carve-out is selective; excludes political, artistic, and cultural speech; viewpoint discrimination. See *303 Creative*; *Masterpiece*; *Lakewood*; supra §VI.D, H.4; Ex. C.

8. **Vagueness / Overbreadth.** Ordinance expands undefined categories ("height," "weight," "source of income") with subpoena and fining powers, inviting arbitrary enforcement. See *Grayned*; *Kolender*; supra §VI.F; Ex. C.

9. **Equal Protection.** Facially neutral law applied with partisan discretion violates equal protection. See *Yick Wo*; supra §H.11; Ex. C.

10. **Retaliatory Purpose.** Ordinance follows coordinated lawfare campaign (Exhibit A); retaliation actionable under §§1983, 1985, 1986. See *Mt. Healthy*; *Perry*; supra §VI.E; Ex. C.

11. **Facial vs. As Applied.** Facial challenges permitted where laws impose unbridled discretion or structural barriers. See *Lakewood*; *MedImmune*; supra §H.12; Ex. C.

12. **Severability.** Core provisions (exhaustion, subpoenas, adjudication) inseverable; without them, Commission collapses into redundancy. See *Alaska Airlines*; supra §H.13; Ex. C.

This section reinforces jurisdictional and procedural sufficiency for all **Counts I through IX of the Complaint**.

---

## J. SUMMARY OF ANTICIPATED DEFENSES

| Defense Likely Raised | Plaintiff's Rebuttal | Authority |
|---|---|---|
| **Standing / Ripeness** | Immediate injury from mandatory exhaustion and partisan tribunal. | *Lujan*; *MedImmune* |
| **Political Question** | Constitutionality is never a political question; core Article III duty. | *Baker*; *Zivotofsky* |
| **Rooker-Feldman** | No state judgment challenged; facial attack on new ordinance. | *Exxon Mobil* |
| **Pullman Abstention** | PHRA settled; no unsettled law. | *Pullman*; Pa. Rest. & Lodging |
| **Younger Abstention** | No ongoing proceeding; bad faith defeats Younger. | *Huffman* |

| Defense Likely Raised | Plaintiff's Rebuttal | Authority |
|---|---|---|
| **Ultra Vires / Separation of Powers** | PHRA allows "similar," not "greater;" judicial power rests in courts. | *Holt's Cigar*; Pa. Const. art. V; *Tumey*; *Ward* |
| **Due Process** | Biased, unsafeguarded tribunal violates Fourteenth Amendment. | *Mathews* |
| **Access to Courts** | Denial of direct judicial access is itself unconstitutional. | *Logan*; *Harbury* |
| **First Amendment Risks** | Religious carve-out selective; compelled speech & viewpoint discrimination remain. | *303 Creative*; *Masterpiece*; *Lakewood* |
| **Vagueness / Overbreadth** | Undefined categories + coercive powers = arbitrary enforcement. | *Grayned*; *Kolender* |
| **Equal Protection** | Neutral text + partisan discretion = discriminatory application. | *Yick Wo* |
| **Retaliatory Purpose** | Ordinance follows coordinated lawfare (Ex. A); retaliation actionable under §§1983, 1985, 1986. | *Mt. Healthy*; *Perry* |
| **Facial vs. As Applied** | Facial challenges are proper where unbridled discretion chills rights. | *Lakewood*; *MedImmune* |
| **Severability** | Core provisions (exhaustion, subpoenas, adjudication) inseverable; Commission collapses. | *Alaska Airlines* |

**In short:** Every defense is anticipated and rebutted. None can preserve this Ordinance, which is structurally, facially, and inseverably unconstitutional.

The rebuttals summarized here correspond to **Counts I through IX of the Complaint**, confirming that no pleaded claim is subject to dismissal on abstention or jurisdictional grounds.

## VII. CONCLUSION

Ordinance 2025-06 has **no legitimate purpose.** Both Pennsylvania law and federal law already provide comprehensive remedies for discrimination in employment, housing, education, and public accommodations. The Pennsylvania Human Relations Act ("PHRA") created a statewide Human Relations Commission with authority to investigate, conciliate, and adjudicate discrimination complaints. Federal statutes — including Title VII, the Fair Housing Act, the ADA, the ADEA, and Titles VI and IX — likewise provide complete enforcement mechanisms through the EEOC, HUD, DOJ, and direct judicial review.[48]

The PHRA permits municipalities to establish commissions only with "powers and duties similar to" the PHRC. Yet Ordinance 2025-06 goes far beyond that limit: it imposes **compulsory exhaustion, grants subpoena and fining powers, and vests adjudicatory authority in partisan appointees.** These features render it **ultra vires, unconstitutional, and preempted**.[49]

Nor is the Ordinance neutral in design. It was enacted in the midst of a **sustained retaliatory campaign** against Plaintiff — defamation suits, malicious prosecution, sanctions, and media attacks — with the clear purpose of obstructing his oversight and chilling further litigation. What is unlawful against one citizen is unlawful against all. Every resident of Delaware County now faces the risk of arbitrary enforcement, coerced participation, and unconstitutional delay of judicial access.

Duplicating remedies already available under state and federal law is not just unlawful — it is wasteful. By forcing litigants through a partisan bottleneck before they can reach the courts, Ordinance 2025-06 **wastes judicial and public resources, undermines constitutional guarantees, and weaponizes "civil rights" rhetoric as a tool of suppression.**

---

[48] PHRA, 43 P.S. §§ 951–963; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; Fair Housing Act, 42 U.S.C. § 3601 et seq.; Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.; Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq.; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.; Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq.

[49] PHRA, 43 P.S. § 962.1 (municipal commissions limited to "powers and duties similar to" PHRC); *Pa. Const. art. V, § 1* (vesting judicial power in courts); *Pa. Restaurant & Lodging Ass'n v. Pittsburgh*, 211 A.3d 810, 823 (Pa. 2019) (local ordinances preempted where state law provides comprehensive remedies).

For these reasons, Ordinance 2025-06 must be declared unconstitutional and enjoined.

The remedies sought herein correspond directly to **Counts I through IX of the Complaint**, ensuring that each pleaded claim is fully supported and preserved.

---

## VIII. REQUESTED RELIEF (RELIEF LADDER)

For the foregoing reasons, Plaintiff respectfully requests that this Court enter judgment in his favor and grant the following relief:

1. **Primary Relief – Total Invalidation.**
   Declare Delaware County Ordinance 2025-06 unconstitutional, ultra vires, and preempted in its entirety, and enjoin all enforcement.

2. **Alternative Tier One – Exhaustion Requirement.**
   Should the Court decline to strike the Ordinance in full, declare unconstitutional and enjoin the **compulsory exhaustion provisions** (§ 6-89(J)(4), (J)(10), (K)), which unlawfully condition judicial access on prior submission to a partisan tribunal.

3. **Alternative Tier Two – Subpoena and Adjudicatory Authority.**
   Alternatively, declare unconstitutional and enjoin the **grant of subpoena power and adjudicatory authority** (§ 6-89(J)(8)–(11)), including the power to compel testimony, hold hearings, impose fines, or issue binding orders, which impermissibly vest judicial powers in unelected volunteers.

4. **Alternative Tier Three – Inseverability.**
   Should the Court strike any of the above provisions, find that the remaining Ordinance is **inseverable**. The Commission's only operative functions are exhaustion, subpoenas, and adjudication. Without these, the Ordinance collapses into redundancy with the Pennsylvania Human Relations Commission and serves no independent purpose.

5. **Ancillary Relief.**
   Preliminarily and permanently enjoin Defendants, their officers, agents, employees, and all persons acting in concert with them, from enforcing, implementing, or taking any action under Ordinance 2025-06.

6. **Fees and Costs.**
   Award Plaintiff costs and reasonable attorney's fees under 42 U.S.C. § 1988,

and Fed. R. Civ. P. 54(d)(1) and 28 U.S.C. § 1920, together with such other and further relief as this Court deems just and proper.

7. **Reasoned Written Opinion.**
   That this Court issue a written opinion with findings of fact and conclusions of law sufficient to permit appellate review, consistent with *SEC v. Chenery Corp.*, 318 U.S. 80 (1943), and Fed. R. Civ. P. 52(a), so that any judgment rendered may be meaningfully reviewed by higher courts.

These requests for mandamus relief under the All Writs Act correspond to **Count IX of the Complaint**.

Pursuant to 28 U.S.C. § 1651(a), Plaintiff further requests issuance of all writs necessary or appropriate in aid of this Court's jurisdiction to **prevent any re-labeling or back-door implementation of enjoined functions (mandatory exhaustion, subpoena/investigation, adjudication, fines) pending final judgment.**

---

**Respectfully submitted,**

*[signature]*

**Gregory Stenstrom, Pro Se**
1541 Farmers Lane
Glen Mills, PA 19342
856-264-5495
gregorystenstrom@gmail.com
gstenstrom@xmail.net

Dated: September 14, 2025

---

Page **23** of **24**

**EXHIBIT LIST**

- **Exhibit A — Coordinated Retaliation & Lawfare Against Plaintiff**
  (3 pages) Summary of defamation suits, malicious-prosecution matter, sanctions campaign, and media coordination; authenticity line included; underlying dockets/orders available on request.

- **Exhibit B — Illustrative Enforcement Scenarios of HRC's**
  (35 pages) Neutral, heavily footnoted examples showing how "neutral" rules—when enforced with **open-ended discretion**—swing between permissive and punitive outcomes (no remedial gap; high risk of arbitrary enforcement). Includes a two-page TOC and an opening **Purpose & Scope** statement.

- **Exhibit C — Anticipated Defenses & Rebuttals Chart**
  (4 pages) One-page bench-memo style table (with memo pin cites and controlling authority) covering standing/ripeness, abstention, ultra vires/separation of powers, due process, access to courts, First Amendment, vagueness/overbreadth, equal protection, retaliation, facial vs. as-applied, and inseverability.

- **Exhibit D — Ordinance 2025-06: Delaware County Human Relations Commission (True & Correct Copy)**
  (19 pages) Full text of the enacted ordinance; page 2 shows the **effective date of January 1, 2026**; Exhibit A to the ordinance contains **§ 6-89** with the complaint process, **subpoena** authority, **hearings/fines**, and **private right of action** the suit challenges.

JS 44  (Rev. 08/18)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

GREGORY STENSTROM, Pro Se

**DEFENDANTS**

Delaware County, Pennsylvania; Delaware County Council; Dr. Monica Taylor; Richard R. Womack; Kevin M. Madden; Elaine Paul Schaefer; Christine A. Reuther; Jack Larkin

**(b)** County of Residence of First Listed Plaintiff    Delaware
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Delaware
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Gregory Stenstrom, Pro Se
1541 Farmers Lane, Glen Mills, PA 19342

Attorneys *(If Known)*
JACK LARKIN, Attorney & Defendant

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ❏ 1  U.S. Government Plaintiff
- ❏ 2  U.S. Government Defendant
- ☒ 3  Federal Question *(U.S. Government Not a Party)*
- ❏ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ❏ 1 | Incorporated *or* Principal Place of Business In This State | ❏ 4 | ❏ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated *and* Principal Place of Business In Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❏ 625 Drug Related Seizure of Property 21 USC 881 | ❏ 422 Appeal 28 USC 158 | ❏ 375 False Claims Act |
| ❏ 120 Marine | ❏ 310 Airplane | ❏ 365 Personal Injury - Product Liability | ❏ 690 Other | ❏ 423 Withdrawal 28 USC 157 | ❏ 376 Qui Tam (31 USC 3729(a)) |
| ❏ 130 Miller Act | ❏ 315 Airplane Product Liability | ❏ 367 Health Care/ Pharmaceutical | | | ❏ 400 State Reapportionment |
| ❏ 140 Negotiable Instrument | ❏ 320 Assault, Libel & Slander | Personal Injury Product Liability | | **PROPERTY RIGHTS** | ❏ 410 Antitrust |
| ❏ 150 Recovery of Overpayment & Enforcement of Judgment | ❏ 330 Federal Employers' Liability | ❏ 368 Asbestos Personal Injury Product Liability | | ❏ 820 Copyrights | ❏ 430 Banks and Banking |
| ❏ 151 Medicare Act | ❏ 340 Marine | | | ❏ 830 Patent | ❏ 450 Commerce |
| ❏ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ❏ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ❏ 835 Patent - Abbreviated New Drug Application | ❏ 460 Deportation |
| ❏ 153 Recovery of Overpayment of Veteran's Benefits | ❏ 350 Motor Vehicle | ❏ 370 Other Fraud | **LABOR** | ❏ 840 Trademark | ❏ 470 Racketeer Influenced and Corrupt Organizations |
| ❏ 160 Stockholders' Suits | ❏ 355 Motor Vehicle Product Liability | ❏ 371 Truth in Lending | ❏ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ❏ 480 Consumer Credit |
| ❏ 190 Other Contract | ❏ 360 Other Personal Injury | ❏ 380 Other Personal Property Damage | ❏ 720 Labor/Management Relations | ❏ 861 HIA (1395ff) | ❏ 485 Telephone Consumer Protection Act |
| ❏ 195 Contract Product Liability | ❏ 362 Personal Injury - Medical Malpractice | ❏ 385 Property Damage Product Liability | ❏ 740 Railway Labor Act | ❏ 862 Black Lung (923) | ❏ 490 Cable/Sat TV |
| ❏ 196 Franchise | | | ❏ 751 Family and Medical Leave Act | ❏ 863 DIWC/DIWW (405(g)) ❏ 864 SSID Title XVI | ❏ 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ❏ 790 Other Labor Litigation | ❏ 865 RSI (405(g)) | ❏ 890 Other Statutory Actions ❏ 891 Agricultural Acts |
| ❏ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | ❏ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ❏ 893 Environmental Matters |
| ❏ 220 Foreclosure | ❏ 441 Voting | ❏ 463 Alien Detainee | | ❏ 870 Taxes (U.S. Plaintiff or Defendant) | ❏ 895 Freedom of Information Act |
| ❏ 230 Rent Lease & Ejectment | ❏ 442 Employment | ❏ 510 Motions to Vacate Sentence | | ❏ 871 IRS—Third Party 26 USC 7609 | ❏ 896 Arbitration |
| ❏ 240 Torts to Land | ❏ 443 Housing/ Accommodations | ❏ 530 General | | | ❏ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ❏ 245 Tort Product Liability | ❏ 445 Amer. w/Disabilities - Employment | ❏ 535 Death Penalty | **IMMIGRATION** | | ❏ 950 Constitutionality of State Statutes |
| ❏ 290 All Other Real Property | ❏ 446 Amer. w/Disabilities - Other | **Other:** ❏ 540 Mandamus & Other | ❏ 462 Naturalization Application ❏ 465 Other Immigration Actions | | |
| | ❏ 448 Education | ❏ 550 Civil Rights ❏ 555 Prison Condition ❏ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1  Original Proceeding
- ❏ 2  Removed from State Court
- ❏ 3  Remanded from Appellate Court
- ❏ 4  Reinstated or Reopened
- ❏ 5  Transferred from Another District *(specify)*
- ❏ 6  Multidistrict Litigation - Transfer
- ❏ 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. §§ 1983, 1985, 1986; 28 U.S.C. §§ 2201–2202; 28 U.S.C. § 1651;
Brief description of cause:
U.S. Const. Amends. I & XIV – Challenge to Delco Ordinance 2025-06

## VII. REQUESTED IN COMPLAINT:

❏ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**    ☒ Yes    ❏ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____    DOCKET NUMBER _____

DATE
09/14/2025

SIGNATURE OF ATTORNEY OF RECORD
/s/ Gregory Stenstrom

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

**I.(a)    Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations.  If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)    County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing.  In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing.  (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)    Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.    Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes.  If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.
United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States.  In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked**.  (See Section III below; NOTE: federal question actions take precedence over diversity cases.)**

**III.    Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

**IV.    Nature of Suit.**  Place an "X" in the appropriate box.  If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable.  Click here for: Nature of Suit Code Descriptions.

**V.    Origin.**  Place an "X" in one of the seven boxes.
Original Proceedings.  (1) Cases which originate in the United States district courts.
Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.
Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.
Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File.  (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.**  Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.    Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553  Brief Description: Unauthorized reception of cable service

**VII.    Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand.  In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.    Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Civil Action No. _____

---

Gregory Stenstrom, Pro Se
Plaintiff,

v.

Delaware County (*for identification of the rulemaking body*);
Delaware County Council (*for identification of the rulemaking body*);
Dr. Monica Taylor, in her official capacity;
Richard R. Womack, in his official capacity;
Kevin M. Madden, in his official capacity;
Elaine Paul Schaefer, in her official capacity;
Christine A. Reuther, in her official capacity;
Jack Larkin, in his official capacity;
and all persons acting under color of Ordinance 2025-06,
Defendants.

---

## PROPOSED ORDER

---

AND NOW, this ___ day of _____, 2025, upon consideration of Plaintiff's Complaint, Memorandum of Law, Motion for Preliminary Injunction, proposed orders, and exhibits, and the Court having reviewed the text of Delaware County Ordinance No. 2025-06 (effective January 1, 2026), the Court **finds** that Plaintiff has established: (1) a strong likelihood of success on the merits; (2) irreparable harm absent injunctive relief; (3) the balance of equities favors Plaintiff; and (4) the public interest favors the protection of constitutional rights. Fed. R. Civ. P. 65.

The Court further **finds** that, on the face of Ordinance 2025-06, Delaware County has: (a) vested judicial powers in partisan, unelected appointees in violation of the Pennsylvania Constitution's vesting of judicial power in the courts; (b) imposed mandatory exhaustion before a partisan tribunal, denying access to courts; (c) authorized subpoenas, hearings, and fines without judicial safeguards, violating due process; (d) expanded undefined categories and discretionary enforcement in a manner that is vague/overbroad; and (e) exceeded the authority permitted by the

Page **1** of **4**

Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 962.1, rendering the Ordinance ultra vires and preempted.

Accordingly, it is **ORDERED**:

## I. DECLARATORY RELIEF (PRIMARY)

1. **Declared Unconstitutional and Ultra Vires.** Delaware County Ordinance No. 2025-06 is **declared unconstitutional and ultra vires in its entirety**. The Court **declares** that Delaware County may not create or empower a Human Relations Commission with subpoena, adjudicatory, fining, or mandatory exhaustion authority that conditions judicial access on prior submission to such a body.

## II. INJUNCTIVE RELIEF (ALTERNATIVE/INDEPENDENT)

2. **Preliminary and Permanent Injunction (Global).** Defendants, their officers, agents, employees, attorneys, and all persons in active concert or participation with them are **ENJOINED** from **enforcing, implementing, funding, staffing, or taking any action under** Ordinance 2025-06.

3. **Specific Provisions Enjoined (Independent Grounds).** Without limiting ¶2, and as independent grounds for relief, the Court **ENJOINS** the following provisions of Ordinance 2025-06, each found facially unlawful:

   - **Mandatory exhaustion / gatekeeping: § 6-89(J)(4), (J)(10), and (K)** (requiring filing with Commission, conditioning judicial access on Commission action).

   - **Subpoena / investigatory compulsion: § 6-89(J)(8)** (Commission subpoenas, compelled testimony, records).

   - **Adjudicatory hearings and fines: § 6-89(J)(9)–(11)** (probable-cause determinations; hearings; orders; fines; enforcement).

   - **Any related provision** that authorizes the Commission to exercise judicial functions or to condition, delay, or extinguish access to courts.

4. **Inseverability.** The Court **finds and declares** that the Ordinance's core functions are exhaustion, subpoena/investigation, adjudication, and fines; without those, the Ordinance collapses into redundancy with the PHRA. The Ordinance is therefore **inseverable**, and **no portion** of the Ordinance may be enforced.

Page **2** of 4

## III. ANCILLARY DIRECTIVES

5. **No Appointments, Funding, or Back-Door Implementation.** Defendants shall not appoint commissioners, expend funds, or otherwise operationalize any Commission or successor body under the Ordinance or under any other label that would replicate the enjoined powers.

6. **Vacatur of Actions (If Any).** To the extent any action has already been taken **under color of Ordinance 2025-06**, such action is **VACATED**, and no rights, obligations, or liabilities shall be deemed to arise therefrom.

7. **Preservation.** Defendants shall **preserve** all documents, communications, budgets, minutes, applications, drafts, and records relating to the Ordinance and any proposed implementation, pending further order of the Court.

8. **Notice.** Within **7 days**, Defendants shall provide written notice of this Order to all relevant County departments, officers, and agents, and shall file a **Certification of Compliance** with the Court within **10 days**.

9. **Bond.** The Court **waives bond** or sets bond at **$0** under Fed. R. Civ. P. 65(c) given the public-interest nature of this constitutional litigation and the absence of risk of monetary harm to Defendants.

10. **Retention of Jurisdiction.** The Court **retains jurisdiction** to enforce this Order and to address any further necessary relief, including costs under Fed. R. Civ. P. 54(d)(1) and 28 U.S.C. § 1920, and any application under 42 U.S.C. § 1988 as permitted by law.

## IV. PROCEDURAL SCHEDULING (IF PRELIMINARY INJUNCTION ENTERED)

11. **Merits Briefing.** If the Court elects to enter preliminary relief only at this time, the following schedule shall apply unless modified by the Court:

- Defendants' combined opposition/cross-motion for summary judgment due **21 days** from entry of this Order;

- Plaintiff's reply/opposition due **14 days** thereafter;

- Defendants' reply (if any) due **7 days** thereafter;

- **Hearing:** at the Court's convenience, on the first available date.

12. **Effectiveness.** This Order is **effective immediately** and shall remain in effect unless modified by further order of the Court.

Page **3** of **4**

SO ORDERED.

_____

United States District Judge